*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0357p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

  *v.*

JAYSON HARRIS,

    *Defendant-Appellant.*

No. 05-3419

>

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 02-00128—Walter H. Rice, District Judge.

Argued:  April 18, 2006

Decided and Filed:  September 15, 2006

Before:  MOORE and GIBBONS, Circuit Judges; SHADUR, District Judge.[*]

---

## COUNSEL

**ARGUED:**  Andrew P. Avellano, Columbus, Ohio, for Appellant.  Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.  **ON BRIEF:** Andrew P. Avellano, Columbus, Ohio, for Appellant.  Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

  SHADUR, D. J., delivered the opinion of the court, in which MOORE, J., joined. GIBBONS, J. (p. 7), delivered a separate dissenting opinion.

---

## OPINION

---

  MILTON I. SHADUR, District Judge.  Jayson D. Harris ("Harris") was indicted for conspiracy to make, utter and possess counterfeit payroll and business checks in violation of 18 U.S.C. §§371 and 513(a).  After the district court denied both Harris' motion to dismiss the indictment and his later motion for rehearing and reconsideration (hereafter the "Motion"), Harris entered a conditional plea of guilty and was sentenced.  Harris now appeals the denial of the Motion,

---

[*] The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

which argued that the government had breached a plea agreement that it had made with him regarding an earlier criminal information. We **VACATE** and **REMAND** for the reasons stated in this opinion.

### Background

On February 22, 2001 Columbus, Ohio Airport Police found Harris in possession of counterfeit American Express traveler's checks and arrested him (J.A. 73).[1] Secret Service Special Agent Joseph Scargill ("Scargill") conducted a post-arrest interview of Harris on the same day, during which Harris told Scargill about his activities regarding the possession of the American Express checks (J.A. 74). Scargill did not ask Harris, nor did Harris tell Scargill, about any other counterfeiting activities (*id*.). Harris then entered into a plea agreement ("Agreement") with the United States as to that possession charge. That charge is not the subject of the current appeal, but these provisions of the Agreement (J.A. 25-26) are relevant here:

> 1. Defendant HARRIS will enter a plea of guilty to Count 1 of the Information filed herein which charges him with possession of counterfeit securities, in violation of 18 U.S.C. §513(a).
>
> *         *         *
>
> 4. Defendant HARRIS agrees to provide a complete statement pertaining to the Information filed herein and to any and all other counterfeit securities activities in which he may have been involved or as to which he may have knowledge. Defendant further agrees to provide a complete statement to authorities of the United States concerning such matters prior to the entry of his guilty plea pursuant to this agreement. Defendant agrees to submit to supplemental debriefings on such matters whenever requested by authorities of the United States whether before or after his plea is entered.
>
>> Pursuant to §1B1.8 of the Federal Sentencing Guidelines, the government agrees that any self-incriminating information so provided will not be used against the defendant in determining the applicable guideline range for sentencing or for departure therefrom.
>
> 5. If such plea of guilty is entered, and not withdrawn, and Defendant HARRIS acts in accordance with all other terms of this agreement, the United States Attorney for the Southern District of Ohio agrees not to file additional criminal charges against Defendant HARRIS based on the counterfeit securities activities charged in the Information or based on other counterfeit activities in the Southern District of Ohio occurring prior to the date of the Information and as to which Defendant gives testimony or makes statements pursuant to this agreement.

As required by the Agreement, on April 20, 2001 Harris entered a plea of guilty to one count of possession of counterfeit securities.[2]

Meanwhile Secret Service Special Agent William Shink ("Shink") was engaged in a separate investigation of a counterfeit securities conspiracy operating in the Dayton, Ohio area. In

---

[1] We refer to the parties' Joint Appendix as "J.A. --."

[2] While the portion of the record cited in Harris' brief does not confirm the statement just made in the text, the case docket in *United States v. Harris*, CR2-01-054, does so.

the course of that investigation, Shink (who had no knowledge of the charges to which Harris had pleaded guilty) had occasion to go to Harris' residence in an effort to speak to him, but Harris refused (J.A. 74).

Nevertheless Shink eventually gathered enough evidence to enable the government to indict Harris (and five others) under 18 U.S.C. §§371 and 513(a) on charges of conspiring to make, utter and possess counterfeit payroll and business checks from a number of businesses (not including American Express) (J.A. 30-36). That indictment, returned on December 10, 2002, charged that the conspiracy had lasted from at least January 2000 up to and including October 4, 2000. (*id*.).

At no point during either the initial possession case or the later conspiracy case did Harris give any statement to any government representative concerning the counterfeiting activities underlying the conspiracy indictment (J.A. 74-76). And importantly in light of the Agreement's provisions, there is no evidence that any government agent undertook any effort to debrief Harris on the subject of his overall knowledge of counterfeit securities activities during the interval between the signing of the Agreement and the entry of his guilty plea to the criminal information.

After the denial of his initial motion to dismiss the conspiracy indictment, Harris followed up with the Motion, arguing that the conspiracy indictment had breached the Agreement and that the only "available and meaningful remedy" for that breach was dismissal of the indictment (J.A. 63-71). In particular Harris argued that the government had breached by "failing to debrief [him] and thereby provide him with the opportunity to obtain the benefits of the government's promise not to prosecute him" for crimes about which he would give statements (J.A. 63).

While the district court "assume[d] for present purposes that the Plea Agreement implicitly obligated the Government to debrief [Harris]" (J.A. 80), it found that obligation had been fulfilled by Shink's spurned attempt to question Harris (J.A. 81). Hence it denied the Motion (*id*.). Harris now appeals that denial.

## Governing Principles and Standard of Review

Plea agreements are contractual in nature, so we use traditional contract law principles in interpreting and enforcing them. *United States v. Lukse*, 286 F.3d 906, 909 (6th Cir. 2002). But because plea agreements' constitutional and supervisory implications raise concerns over and above those present in the traditional contract context, in interpreting such agreements we "hold[ ] the government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in the plea agreements." *United States v. Johnson*, 979 F.2d 396, 399 (6th Cir. 1992), quoting *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). And once such an agreement is interpreted, the burden of proving its breach falls on the party asserting the breach. *United States v. Smith*, 429 F.3d 620, 630 (6th Cir. 2005).

As to our standard of review on appeal, while we review a district court's findings of fact for clear error, all conclusions of law, questions of mixed law and fact and "findings of ultimate facts which result from the application of legal principles to subsidiary factual determinations" are subject to de novo review. *Brentwood v. Tenn. Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 420 (6th Cir. 2006). We apply those standards in the ensuing analysis.

## Obligations Under the Agreement

Like all contracts, the Agreement imposed obligations on both parties. While Harris argues that the government breached its obligation to "debrief" him, the government urges that it was rather Harris who breached his obligation to provide statements about his counterfeiting activities, so that his request for relief--dismissal of his indictment--must be denied. As the discussion below

explains, we hold that the government did indeed breach its obligation under the Agreement, but that the record is insufficient to determine whether Harris breached as well.

**Government's Obligation**

Agreement ¶ 4 speaks of two types of possible statements by Harris: an initial "statement," to be provided before entry of his guilty plea, and "supplemental debriefings" to which he must submit "whenever requested," either before or after entry of the plea (J.A 226). When those provisions are read together (the universal principle of contract construction), they required the United States to provide Harris an opportunity to give such statement--an obligation that the government failed to meet.

In that respect the key to an integrated reading of the Agreement is its reference to "supplemental debriefings." Both in common parlance and as a matter of common sense, a "debriefing" denotes an interrogation--the eliciting of information through active inquiry. As Webster's Third New Int'l Dictionary (unabridged, 1986) 582 puts it, to "debrief" is " to interrogate (as a pilot returning from mission or a government official returning from abroad) in order to obtain useful information or intelligence."

That being so, the same concept of an integrated reading of the Agreement carries with it the proposition that for the later potential statements to be "supplemental debriefings," the initial statement that Harris agreed to provide in the first sentence of Agreement ¶ 4 was also to be provided in the course of a "debriefing." Again such a reading is eminently sensible, even apart from the resolution of any arguable ambiguities in the Agreement against the government (*Johnson*, 929 F.2d at 399): Questioning by a skilled interrogator, aware of the focus of inquiry, is plainly a far more efficient and effective means of obtaining useful information than relying on the potential source of the information to provide the necessary orderly input.

Hence a fair reading of the Agreement is that it obligated the government to "debrief" Harris in the first instance--to give him an express opportunity to make statements about both his possession of counterfeit securities and "any and all other counterfeit securities activities" of which he was aware. In that regard the district court accepted that proposition arguendo en route to its ultimate decision (J.A. 80)--we, however, find it established as a legal matter.

In the first instance--that is, in the course of Harris' first prosecution--there is no doubt that the government failed to carry out its part of the bargain. When Agent Scargill conducted his post-arrest interview of Harris, he understandably spoke to him only about his *possession* activities--he never asked Harris about any other counterfeiting activities (J.A. 74). But then, once the Agreement was entered into, it was entirely reasonable for Harris to expect the government to initiate a debriefing that would encompass inquiry into everything that he knew about counterfeit securities activities, so that the immunity provisions of ¶ 5 would be triggered. Yet there is no evidence that any other government agent sought to debrief Harris as to such matters before the entry of his guilty plea to the original information.

As for Harris' contact with Shink, that took place in May 2002, more than a year after the April 10, 2001 entry of that guilty plea. More on that subject later.

**Harris' Obligation**

While the Agreement obligated the government to "debrief" Harris, it also obligated Harris to submit to any such debriefing, whether an initial pre-plea debriefing or a "supplemental" one. According to the government, Shink did in fact attempt to engage in a debriefing of Harris (if so, that would have to fit within the Agreement's reference to a "supplemental" one, for it occurred after Harris had entered his plea), but Harris refused, thereby breaching his end of the bargain. While we

agree that a refusal to submit to a full debriefing would indeed breach the Agreement, the record leaves unclear whether Shink's actions actually constituted such an attempted debriefing, and therefore whether Harris' refusal to speak to him constituted a breach.

In defending his actions, Harris argues that Shink's attempt to speak to him regarding his conspiracy-related counterfeiting activities did not qualify as a debriefing because it was not "in relation to" or "in conjunction with" the "Columbus case"--Harris' initial prosecution for possession. Harris does not, however, make clear just what he means by that claim.

If Harris' contention is that Shink's contact with him must literally have been about the subject matter of the "Columbus case," or that Shink must have been aware of the Agreement (or was at least sent by someone who was, such as Scargill), we disagree. On that score, Agreement ¶ 4 specifies that supplemental debriefings, which could take place either before or after entry of the plea to the criminal information, could cover not only the earlier Columbus possession charge but also "any and all other counterfeit securities activities in which [Harris] may have been involved or as to which [Harris] may have knowledge." And Agreement ¶ 4 imposes no limitation as to who might request those debriefings, other than that they be "authorities of the United States."

We do, however, find merit in Harris' claim at oral argument that if Shink's attempt to speak to Harris is to be viewed as satisfying the government's obligation, Shink must have sufficiently informed Harris of the reason for his visit. If Shink indeed failed to do so, Harris would not only have had no reason to assume Shink's contact was actually one of the debriefings to which the Agreement required him to submit, but would have had every reason to be concerned about incriminating himself as to whatever other crimes Shink might be inquiring about. Any refusal to speak to Shink under such unspecified circumstances would not violate Harris' obligations under the Agreement.

Regrettably, the district court's opinion stated only that, on the arguendo assumption that a government obligation existed, Shink's actions met it because they "afforded [Harris] an opportunity to give a statement" (J.A. 80-81). Nothing was said there by way of any finding as to what (if anything) Shink told Harris about Shink's reasons for coming to him or as to whether, in deciding that Shink's actions had satisfied the government's obligation, the district court actually measured them against the debriefing standard that we have articulated.

Instead the only record reference to that critical subject is a brief leading question to Shink and an uncertain answer on his part during the course of the hearing below (J.A. 121-22):

> Q: Did you explain to [Harris] what you wanted to talk to him about?
>
> Shink: I believe so. I don't recall the exact content of the conversation but I had gone through Mr. Harris's probation officer and explained the case to him and asked for a contact number for Mr. Harris.

There was no follow-up inquiry that would have clarified whether Shink apprised Harris that he was seeking a full debriefing as to all of Harris' knowledge of counterfeit securities activities (so that Harris' rejection would be a breach of his agreement) or whether no such explanation took place (and hence there would be no breach by Harris). And no inquiry was made of Harris on that key subject either.

We are thus unable to determine whether the district court's application of law to facts was appropriate, and accordingly we remand the case. Upon remand the district court should determine both (1) what Shink told Harris about his reason for coming to him (a determination that will require a further evidentiary hearing) and (2) whether that factual determination connotes a "debriefing" in accordance with this opinion. Resolution of those two issues will control whether

or not the indictment in this case is to be dismissed.  With all respect, the dissenting opinion appears to assume that an answer to those questions is unnecessary for our decision--an assumption that we believe is unwarranted.

## Conclusion

In sum, we **VACATE** the district court's denial of Harris' Motion and **REMAND** the case to the district court for further proceedings consistent with this opinion.

---

**DISSENT**

---

JULIA SMITH GIBBONS, Circuit Judge, dissenting. I cannot agree with the majority's reading of the plea agreement in this case and therefore dissent. Under the agreement's plain language, Harris had an obligation to provide the government with a complete statement pertaining to the information to which he pled guilty and all other counterfeit securities activities in which he was involved or of which he had knowledge. He agreed to provide the statement prior to entry of his guilty plea, although he did not in fact do so. He also agreed to submit to supplemental debriefing on counterfeit securities matters when requested by the government at any time.

Onto this rather straightforward, simple agreement the majority grafts two provisions not included in its terms–an obligation on the part of the government to contact Harris to give him an opportunity to make a statement and an obligation on the part of the government to question Harris in order to obtain his statement. The majority also reads the agreement in a way that deletes a clear requirement under its terms–Harris is relieved of his obligation to make a complete statement as defined in the agreement. In so doing, the majority creates a scenario that is not based on the agreement but rather its own set of expectations about how matters should have proceeded between Harris and the government.

Whatever duty the government might have to interview a defendant in other contexts and under other agreements, under *this* agreement there was no such duty. In order to avoid prosecution for counterfeit securities charges not covered in the information, Harris had to make a complete statement, even in the absence of any initiating action by the government. The agreement is silent as to the statement's form; Harris or his counsel could have submitted a written statement in letter or other form or could have made an appointment with government representatives to give an oral statement. The obligation was that of Harris, not the government.

The district court's finding of fact that Harris did not give a statement is not clearly erroneous. Thus, Harris breached the agreement by failing to give a complete statement initially, and the government was free to prosecute him in the Dayton case. Harris also likely breached the agreement in refusing Shink's request for interview, although the majority correctly notes that the record is sketchy on this issue. But we need not resolve the issue of whether the refusal of a request for interview was a breach because Harris had already breached the agreement in failing to give a complete statement.

We should affirm Harris's conviction.