# STATE OF CONNECTICUT *v.* JONATHAN RIVERS
## (SC 17665)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.*

* The listing of justices reflects their seniority status as of the date of oral argument.

Argued February 14—officially released September 4, 2007

*Gary A. Mastronardi*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Jonathan Rivers, appeals[1] from the judgment of conviction rendered by the trial court following his conditional plea of nolo contendere, under General Statutes § 54-94a,[2] to one count of felony murder in violation of General Statutes § 53a-54c. On appeal, the defendant claims that the trial court incorrectly concluded that the defendant had breached the terms of his plea agreement and, therefore, improperly denied his motion to dismiss certain charges against him,[3] including the felony murder count, in accordance with that agreement. The defendant claims that he per-

---

[1] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[3] In addition to felony murder, the defendant also was charged in a substitute information with kidnapping in the first degree, robbery in the first degree and conspiracy to commit robbery in the first degree.

formed in accordance with the terms of the agreement and that, consequently, he is entitled to specific performance. We conclude that the defendant did not breach the agreement. Accordingly, we reverse the trial court's judgment and remand the case with direction to grant the defendant's motion to dismiss and to order specific performance of the plea agreement.

The essential facts relevant to our disposition of this appeal are undisputed. On July 21, 2000, the defendant, under the direction of Miguel Estrella, a drug dealer for whom the defendant worked at the time, drove with Robert Marrow to Meriden to meet Juan Disla with the intention of robbing Disla of money and drugs that Disla was expecting to sell to Estrella. Disla met the defendant and Marrow in a parking lot, where Marrow brandished a gun and ordered Disla into the rear of the van that Disla had been driving. While Marrow held Disla at gunpoint, the defendant drove Disla's van around Meriden waiting for instructions from Estrella. During this time, Marrow shot Disla in the leg to incapacitate him and to prevent him from escaping. The wound was not life threatening.

The defendant then drove the van to meet Estrella and Lawrence Smith, another accomplice. When Estrella realized that Disla had recognized that he was responsible for the abduction, he and Smith decided that Disla had to be killed. Estrella then drove the van, with the defendant, Marrow, Smith and Disla inside, to a remote wooded area.[4] There, Marrow strangled Disla and left his body under a tree. Two days later, Estrella and Smith returned and dismembered the body with a chainsaw. They then dissolved the body parts in acid.[5]

---

[4] At some point, the group had stolen a large quantity of drugs from Disla's van.

[5] Although the defendant apparently was not involved in the dismemberment and disposal of Disla's body, he received some of the drugs that had been taken from Disla's van. See footnote 4 of this opinion.

Between December, 2000, and February, 2001, all four men were arrested in connection with Disla's murder. The defendant was arrested on February 1, 2001, and initially was charged with assault in the first degree, kidnapping in the first degree, and conspiracy to commit murder. The defendant thereafter agreed to cooperate with the police, and, on February 13, 2001, the defendant and the state entered into a plea and cooperation agreement.[6] Under that agreement, the defendant

---

[6] The plea and cooperation agreement, which we hereinafter refer to as the plea agreement or agreement, provides: "With respect to the meeting [between the state and the defense], on February 13, 2001, the following understandings exist:

"(1) This meeting has been agreed upon for the purpose of discussing evidence of criminal wrongdoing about which [the defendant] is aware. The [s]tate will consider the evidence discussed at this meeting to assess [the defendant's] potential ability to cooperate with the [s]tate. It is understood by [the defendant] that everything he says must be truthful and accurate to the best of his ability to recall.

"(2) Any statements made by [the defendant] at this meeting will not be offered against him in the [s]tate's direct case in the pending state criminal cases against [the defendant], unless [the defendant] breaches this agreement as provided in [paragraphs] (4) or (6) below.

"(3) It is understood that the [s]tate will use and pursue any investigative leads suggested directly or indirectly by [the defendant's] statements or information at this meeting. Any evidence developed through pursuing such investigative leads can be used by the [s]tate against [the defendant] in any prosecution of the [defendant] and in civil proceedings involving [the defendant] or his assets. [The defendant] agrees that this understanding will eliminate the need for a future hearing at which the [s]tate might have to prove that the evidence it intends to introduce against [the defendant] is not tainted by, or derived from, [the defendant's] statements or other information provided at this meeting.

"(4) It is understood that in the event [the defendant] becomes a witness at any trial and his testimony is materially different from any statements or information disclosed at this meeting, the [s]tate may and will use [the defendant's] statements at this meeting to impeach or cross-examine [the defendant]. It is also understood that materially different testimony at trial indicates a lack of candor by [the defendant], either in the original statement or at trial, which constitutes a breach of the agreement. The agreement will then become null and void.

"(5) It is understood that the [s]tate may and will use [the defendant's] statements at this meeting in any rebuttal case in the trial of [the defendant] in the pending criminal cases against [the defendant].

agreed to plead guilty to kidnapping in the first degree and to cooperate with the state, and the state agreed to make certain sentencing recommendations to the court. That same day, in the presence of counsel, the defendant provided a tape-recorded statement to the Meriden police regarding the events surrounding Disla's murder.

On August 2, 2001, the defendant testified at Estrella's probable cause hearing, providing truthful testimony consistent with his prior statement to the police, and

"(6) It is understood that nothing in this agreement shall be construed to protect [the defendant] from prosecution for perjury, false statement or obstruction of justice, or any other offense he commits after the date of this agreement. The statements and information [the defendant] provides at this meeting may be used against him in any such prosecution. It is further understood that if the [s]tate determines that [the defendant] has intentionally provided false, misleading and inaccurate statements or information at this meeting, or at any trial, then this agreement will become null and void.

"(7) It is understood that members of the [o]ffice of the [s]tate's [a]ttorney for [the judicial district of] New Haven will determine, in their sole discretion, whether the [defendant's] statement is truthful and also whether the [defendant] possesses sufficient personal knowledge of events to serve as the basis for the prosecution of those involved in the murder of . . . Disla. If members of the [o]ffice of the [s]tate's [a]ttorney so determine, then the [s]tate agrees that [the defendant] will be allowed to plead guilty to [k]idnapping in the [f]irst [d]egree in the case for which he was arrested on February 1, 2001. The [s]tate will then recommend that the sentence in all state cases pending against [the defendant] as of the date of this agreement will be [twenty] years, execution suspended after a period of from [five] to [ten] years, as determined by the court, and five years probation. During [the defendant's] incarceration, the [s]tate will take all steps possible to house him in a facility separate from any of the people named in his statement. Further, upon a request [establishing] that [the defendant] is likely to be in danger upon his release, the [s]tate will assist [the defendant] in relocating to a safer place, pursuant to state witness protection regulations.

"(8) The foregoing is the complete agreement between the [s]tate and [the defendant]. Specifically, the [s]tate is not hereby agreeing that it will subsequently enter into a plea or cooperation agreement with [the defendant], except under the conditions set out above."

The defendant and his trial counsel signed the agreement under a line that provides: "I have read and discussed the terms of this proffer agreement with my attorney and I accept them."

the court found probable cause to proceed with Estrella's trial for the murder of Disla. Following his testimony at the hearing, the defendant's bond was reduced from $1 million to $75,000. The defendant posted bond and was released. While free on bond, the defendant was arrested and charged in New Haven with several additional criminal offenses unrelated to the case involving the murder of Disla.

Evidence in the trial of Estrella began on September 22, 2003. On that day, the state called the defendant as a witness, but, on the advice of counsel, he invoked his fifth amendment privilege against self-incrimination and declined to testify. Thereafter, the trial court found that the defendant was unavailable to testify and allowed the state to introduce his testimony from the probable cause hearing. Estrella subsequently was convicted as charged.[7]

On October 2, 2003, immediately following Estrella's trial, the state declared its plea agreement with the defendant to be null and void and filed a new information charging the defendant with felony murder, kidnapping in the first degree, robbery in the first degree and conspiracy to commit robbery in the first degree. The state claimed that the defendant had violated, and thereby had vitiated, the agreement when he refused to testify at Estrella's trial and, therefore, no longer was entitled to the benefits of the arrangement.

The defendant filed a motion in limine, seeking to preclude the state from using any of his previous statements against him in its case-in-chief, including all written and recorded statements that he had provided to

---

[7] Estrella had been charged with murder, felony murder, conspiracy to commit murder and conspiracy to commit robbery in the first degree. *State v. Estrella*, 277 Conn. 458, 461–62, 893 A.2d 348 (2006). The state's case against Estrella rested almost entirely on the defendant's prior testimony and tape-recorded conversations between Estrella and his cellmate. Id., 462. This court affirmed Estrella's conviction. Id., 489.

the police and his testimony at Estrella's probable cause hearing. In support of the motion, the defendant claimed that, according to the terms of the plea agreement, the state could not use any of the statements or information that he had provided, other than for impeachment purposes, unless he had breached the agreement. The defendant further claimed that the invocation of his privilege against self-incrimination did not constitute a breach of the agreement. In opposing the motion, the state claimed that the defendant's refusal to testify, although a proper exercise of his constitutional rights, nevertheless constituted "a bad faith breach of the obligations [that] he [had] entered into in the [plea] agreement," and that, under the terms of paragraph two of the agreement; see footnote 6 of this opinion; the defendant's breach allowed the state to use his prior statements against him in its case-in-chief.

The trial court conducted a hearing on the motion.[8] Defense counsel claimed, inter alia, that the defendant was not required to testify under the terms of the plea agreement and, therefore, that the defendant's invocation of his fifth amendment right against self-incrimination did not constitute a breach of the agreement.[9] Defense counsel further maintained that the state had obtained the benefit of its bargain by virtue of its use of the defendant's probable cause hearing testimony at Estrella's trial. Finally, defense counsel claimed that, even though he believed that the defendant was entitled to specific performance of the plea agreement, if the state insisted on proceeding against the defendant, it

---

[8] The hearing consisted of argument of counsel; no testimony was presented.

[9] Defense counsel further claimed that genuine "fifth amendment concerns" regarding the charges pending against the defendant for matters unrelated to Disla's murder had prompted him to advise the defendant to invoke his fifth amendment privilege. Defense counsel represented that he had informed the state of the defendant's intention to do so prior to the defendant's being called as a witness.

should not be permitted to use the defendant's statements against him in its case-in-chief. The state claimed that the defendant had waived his fifth amendment rights in executing the agreement and that, regardless of whether his invocation had been in good or bad faith, it constituted a breach of the terms contained in paragraph four of the agreement, which, according to the state, required the defendant to "testify truthfully or in conformance with his statement . . . ." Therefore, the state contended, because the defendant had abrogated, and thereby nullified, the agreement, the state was not obligated to uphold its end of the bargain and was entitled to use the defendant's prior statements as evidence against him.

In a memorandum of decision, the trial court denied the defendant's motion in limine, concluding that the defendant had breached paragraph four of the agreement; see footnote 6 of this opinion; because "the defendant acted in bad faith in invoking his fifth amendment privilege and thereby breached the [plea] agreement rendering [it] null and void." Specifically, the trial court observed that, although "there was no explicit provision in the [plea] agreement requiring [the defendant] to testify . . . the defendant breached the agreement by failing to fulfill his obligation under the agreement in good faith." In reaching this conclusion, the court determined that the defendant's invocation of his privilege against self-incrimination amounted to "an attempt to violate the spirit of the proffer agreement and yet still reap its benefits." The trial court ultimately concluded that "the state bargained for [the defendant's] testimony against . . . Estrella in exchange for [the defendant's] reduced sentence and charges. Since the state has not received the benefit of its bargain then [the defendant] should not be allowed to unjustly enrich himself with the reduced charges and reduced sentence." Thereafter, the trial court granted the defen-

dant's motion for reargument but denied his motion for reconsideration.

The defendant subsequently filed a motion to dismiss all of the charges against him except for the charge of kidnapping in the first degree. In the motion to dismiss, the defendant requested an order of specific performance of the plea agreement. The defendant claimed that he was entitled to specific performance because he had cooperated with the state in accordance with the terms of the plea agreement and that the state had received the benefits of his cooperation.[10]

The trial court denied the motion to dismiss, relying on the same grounds that it had cited in denying the defendant's motion in limine. The court expressly incorporated by reference its previous memorandum of decision, reiterating that, in light of the bargain struck in the agreement, the defendant had acted in bad faith in refusing to testify: "There was an agreement to deliver.

---

[10] We note that, before he sought specific performance of the agreement in the motion to dismiss, the defendant had stated in his motion for reargument and reconsideration of the denial of his motion in limine that, "as of [December 10, 2004], the state is no longer interested in offering the defendant a 'reduced charge and reduced sentence' and the defendant is no longer interested in accepting one." The defendant further stated: "[Although] the defendant . . . continues to assert that he did *not* breach the agreement, whether there was an actual breach does not matter since neither side is seeking to enforce the primary terms of that agreement—i.e., a reduced plea and sentence in return for testimony. The issue to be decided by the court, rather, pursuant to the defendant's motion, is whether the defendant's testimony and statements, (in and out of court), which the state obtained pursuant to [an] . . . agreement which both sides have now forsaken, (regardless of the reason), may now be used against the defendant in the state's *case-in-chief*, even though the agreement expressly provides that, in such event, at best, the statements can only be used to impeach the defendant *if he takes the stand to testify.*" (Emphasis in original.) Although this language appears to contradict the defendant's subsequent request for specific performance of the agreement, the defendant did not waive his right to raise a claim for specific performance on appeal to this court because he properly raised that claim in the motion to dismiss that he filed with the trial court.

[The defendant], by invoking the fifth amendment, did not deliver what was bargained for. And, therefore, to come into this court now and ask for . . . specific performance, I think, again, would result in bad public policy."

Thereafter, the defendant entered a conditional plea of nolo contendere to the charge of felony murder pursuant to which he reserved his right to appeal from the trial court's denial of his motion to dismiss and his request for an order of specific performance. The trial court accepted the plea, and the defendant was sentenced to a term of imprisonment of twenty-five years. This appeal followed.

The defendant claims that the trial court improperly denied his motion to dismiss because, having complied with the express terms of the plea agreement by providing truthful information to the state, he is entitled to specific performance. The state contends that the defendant breached the agreement when he refused to testify at Estrella's trial, thereby nullifying the agreement and forfeiting the benefits of the bargain contemplated therein. Additionally, the state claims that, even if this court determines that the defendant did not breach the agreement by refusing to testify, an order of specific performance is improper because a determination of whether the defendant is entitled to specific performance would require the trial court to consider the equities involved in ordering such a remedy. We agree with the defendant.

At the outset, we note the standard governing our review of the trial court's denial of a motion to dismiss. Because a motion to dismiss effectively challenges the jurisdiction of the court, asserting that the state, as a matter of law and fact, cannot state a proper cause of action against the defendant, our review of the court's legal conclusions and resulting denial of the defendant's

motion to dismiss is de novo. See, e.g., *State* v. *Haight*, 279 Conn. 546, 550, 903 A.2d 217 (2006).

We begin with an overview of the law governing plea agreements. "[P]rinciples of contract law and special due process concerns for fairness govern our interpretation of plea agreements." (Internal quotation marks omitted.) *State* v. *Stevens*, 278 Conn. 1, 7–8, 895 A.2d 771 (2006), quoting *Spence* v. *Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 167–68 (2d Cir. 2000); see also *State* v. *Lopez*, 77 Conn. App. 67, 77, 822 A.2d 948 (2003) ("a plea agreement is akin to a contract and . . . well established principles of contract law can provide guidance in the interpretation of a plea agreement"), aff'd, 269 Conn. 799, 850 A.2d 143 (2004). Thus, "[t]he validity of plea bargains depends on contract principles." *State* v. *Garvin*, 242 Conn. 296, 314, 699 A.2d 921 (1997). "Because [plea agreements] implicate the waiver of fundamental rights guaranteed to persons charged with crimes, [however, they] must . . . be evaluated with reference to the requirements of due process." *Innes* v. *Dalsheim*, 864 F.2d 974, 978 (2d Cir. 1988), cert. denied, 493 U.S. 809, 110 S. Ct. 50, 107 L. Ed. 2d 19 (1989). Therefore, "[w]hen a guilty plea is induced by promises arising out of a plea bargaining agreement, fairness requires that such promises be fulfilled by the state." (Internal quotation marks omitted.) *State* v. *Garvin*, supra, 313–14; see *Santobello* v. *New York*, 404 U.S. 257, 261–62, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971); see also *United States* v. *Clark*, 55 F.3d 9, 12 (1st Cir. 1995) ("[b]ecause plea bargaining requires defendants to waive fundamental constitutional rights . . . prosecutors engaging in plea bargaining [are held] to the most meticulous standards of both promise and performance" [internal quotation marks omitted]), cert. denied, 519 U.S. 909, 117 S. Ct. 272, 136 L. Ed. 2d 195 (1996).

"When the contract language relied on by the trial court is definitive, the interpretation of the contract is a matter of law and our review is plenary."[11] *State* v. *Stevens*, supra, 278 Conn. 8. When evaluating a contract, "[w]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . [When] the language is unambiguous, we must give the contract effect according to its terms. . . . [When] the language is ambiguous, however, we must construe those ambiguities against the drafter." (Citations omitted.) *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 735, 873 A.2d 898 (2005). Whether a contract is ambiguous is a question of law over which we exercise de novo review. See, e.g., *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 669, 791 A.2d 546 (2002); *Imperial Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 322 n.6, 714 A.2d 1230 (1998).

In cases involving agreements like the plea agreement at issue in the present case, the drafter of the agreement, the state, generally holds substantially superior bargaining power over the other party to the agreement, the criminal defendant. As the Second Circuit has explained, "[b]ecause the government ordinarily has certain awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." (Internal quotation marks omitted.) *United States* v. *Palladino*, 347 F.3d 29, 33 (2d Cir. 2003); see also *Spence* v. *Superintendent, Great Meadow Correctional Facility*, supra, 219 F.3d 167 ("a court must look to what the parties reasonably under-

---

[11] We note that, in the course of the trial court proceedings, the parties did not offer extrinsic evidence regarding the formation of the agreement. The court's determination regarding the bargain contained in the agreement, therefore, was based solely on the written agreement itself.

stood the terms to mean, and resolve any ambiguity in the [plea] agreement in favor of the defendant"); *Innes* v. *Dalsheim*, supra, 864 F.2d 979 ("the state must bear the burden for any lack of clarity in the [plea] agreement"). Thus, the state, as the drafting party wielding disproportionate power, must memorialize any and all obligations for which it holds the defendant responsible, as well as all promises that it has made for the purpose of inducing the defendant to cooperate. The terms of the agreement should be stated clearly and unambiguously, so that the defendant, in assenting to waive certain fundamental rights, knows what is expected of him and what he can expect in return. Likewise, such clarity ensures that the state knows what it may demand of the defendant and what it is obligated to provide in exchange for the defendant's cooperation. See, e.g., *Innes* v. *Dalsheim*, supra, 980 (concluding that when court failed to articulate clearly that, in accepting plea agreement, defendant was waiving right to trial in case of breach, construing ambiguity against state and allowing defendant to stand trial after breach "should encourage greater clarity and specificity in plea negotiations and plea agreements . . . [and] tend to ensure fairness, stabilize and finalize the parties' expectations, and reduce the waste of judicial resources required to review challenges to . . . pleas that are encouraged when the record of the plea proceedings is ambiguous").

Indeed, a majority of the federal Circuit Courts of Appeals follow similar rules, construing ambiguity in plea agreements against the government. E.g., *United States* v. *Cachucha*, 484 F.3d 1266, 1270 (10th Cir. 2007) (In applying contract principles to a plea agreement, the court will "construe ambiguities against the government as the drafter of the document. . . . It is well settled that [the court] must interpret the agreement according to the defendant's reasonable understanding

of its terms." [Citation omitted; internal quotation marks omitted.]); *United States* v. *Harris*, 473 F.3d 222, 225 (6th Cir. 2006) (because "constitutional and supervisory implications" of plea agreements raise concerns additional to those present in traditional contract context, court holds government to higher standard of accountability for ambiguities in agreement than defendant, and possibly to higher standard than it would hold either party in construing commercial contract); *United States* v. *Sibley*, 448 F.3d 754, 759 (5th Cir. 2006) (court "must construe all ambiguities in the plea agreement against the government" [internal quotation marks omitted]); *United States* v. *Andis*, 333 F.3d 886, 890 (8th Cir.) ("ambiguities [in a plea agreement] are construed against the government" [internal quotation marks omitted]), cert. denied, 540 U.S. 997, 124 S. Ct. 501, 157 L. Ed. 2d 398 (2003); *United States* v. *Baird*, 218 F.3d 221, 229 (3d Cir. 2000) ("[i]n view of the government's tremendous bargaining power, [the court] will strictly construe the text [of a plea agreement] against it when it has drafted the agreement"); *United States* v. *Jefferies*, 908 F.2d 1520, 1523 (11th Cir. 1990) ("a plea agreement that is ambiguous must be read against the government" [internal quotation marks omitted]); *United States* v. *Giorgi*, 840 F.2d 1022, 1026 (1st Cir. 1988) ("Given the relative interests implicated by a plea bargain . . . the costs of an unclear agreement must fall [on] the government. . . . [T]he government must shoulder a greater degree of responsibility for lack of clarity in a plea agreement."); *United States* v. *Harvey*, 791 F.2d 294, 300 (4th Cir. 1986) ("constitutional and supervisory concerns require holding the [g]overnment to a greater degree of responsibility than the defendant . . . for [imprecision] or ambiguities in plea agreements"); cf. *United States* v. *Clark*, 218 F.3d 1092, 1095 (9th Cir.) (when plea agreement contains ambiguities, court will first look to facts and extrinsic evidence to

determine what parties reasonably understood to be terms of agreement and, if ambiguity remains, "government ordinarily must bear responsibility for any lack of clarity . . . [because] [c]onstruing ambiguities in favor of the defendant makes sense in light of the parties' respective bargaining power and expertise" [citations omitted; internal quotation marks omitted]), cert. denied, 531 U.S. 1057, 121 S. Ct. 668, 148 L. Ed. 2d 569 (2000); *United States* v. *Williams*, 102 F.3d 923, 927 (7th Cir. 1996) (court reviews language objectively, holding government to literal terms of agreement so that, "[a]lthough [the] government must fulfill any express or implied promise made in exchange for [the] . . . plea, the parties' rights under the plea agreement are limited to those matters [on] which they actually agreed").

With these standards in mind, we turn to the dispute in the present case. As we noted previously, the trial court found that "there was no explicit provision in the [plea] agreement requiring [the defendant] to testify" but nonetheless determined that the defendant's invocation of his fifth amendment privilege against self-incrimination constituted a bad faith breach of the "spirit" of the agreement. The state apparently concedes that there is no such *express* requirement by virtue of its claim that paragraph four of the agreement *implies* such an obligation. Paragraph four of the agreement provides: "It is understood that in the event [the defendant] becomes a witness at any trial and his testimony is materially different from any statements or information disclosed at this meeting, the [s]tate may and will use [the defendant's] statements at this meeting to impeach or cross-examine [the defendant]. It is also understood that materially different testimony at trial indicates a lack of candor by [the defendant], either in the original statement or at trial, which constitutes a breach of

the agreement. The agreement will then become null and void."

The state claims that paragraph four "necessarily implied an affirmative obligation on the part of the defendant to testify in conformity with his prior statements in the event that he became a witness at any trial." The state further claims that, under paragraph four, "[a] refusal to provide any testimony . . . is 'materially different' in effect from testimony that conforms to a prior statement." The defendant claims, to the contrary, that he was obligated solely to provide truthful and accurate information regarding the murder of Disla. The defendant contends that, in the absence of either a claim by the state that the defendant failed to meet this obligation or a provision expressly providing that he must testify, he could not have breached the agreement.

In light of the fact that the agreement only addresses the truthfulness of the defendant's testimony "in the event [the defendant] becomes a witness," we conclude that the trial court properly concluded that this provision did not constitute an explicit requirement that the defendant testify for the state. Because we must construe ambiguous language against the state, however, we disagree with the trial court's conclusion that it could read into the terms of the agreement an implicit obligation to testify.

We first note that paragraph eight of the agreement counsels against reading an additional obligation into the agreement. That paragraph states: "The foregoing is the complete agreement between the [s]tate and [the defendant]." Footnote 6 of this opinion.

In addition, in light of the fundamental nature of an obligation to testify in the context of a cooperation agreement, we expect and require that, when the government intends for a cooperating defendant to testify,

it will include such an explicit requirement in the agreement. See *State* v. *Nelson*, 23 Conn. App. 215, 219, 579 A.2d 1104 ("[I]t was incumbent upon the state to enunciate what was and was not covered by the [plea] agreement lest the defendant be allowed to go to plea under the impression that the criminal portion of this tragic episode was closed. If the state was reserving a right to reprosecute in the event of the victim's death, it could have, and should have, said so. It did not even remotely imply that this was its intent."), cert. denied, 216 Conn. 826, 582 A.2d 205 (1990), cert. denied, 499 U.S. 922, 111 S. Ct. 1315, 113 L. Ed. 2d 248 (1991). Unless a plea agreement contains an explicit provision requiring that a defendant fulfill a substantial obligation such as testifying, this court will not require the defendant to do so. Likewise, the state may not claim retroactively that a particular act or omission of a defendant constituted a breach of an agreement when the language of the agreement does not prohibit such an act or omission. See *Spence* v. *Superintendent, Great Meadow Correctional Facility*, supra, 219 F.3d 168–69 (concluding that state failed to prove that defendant had breached plea agreement by getting arrested for act he did not commit when what constituted breach was left ambiguous by sentencing court, and defendant's interpretation of agreement as prohibiting only actual misconduct was reasonable); *State* v. *Rosado*, 92 Conn. App. 823, 828–29, 887 A.2d 917 (2005) (concluding that trial court failed to articulate clearly that defendant's conduct would constitute breach of plea agreement, reasoning that, "if the court sought to convey to the defendant that violating any of the rules and regulations of the [alternative incarceration] center would also constitute a breach of the plea agreement, the court could have clearly communicated that to him").

Finally, it is undisputed that the defendant testified truthfully at the probable cause hearing, that the state

was able to use that testimony at Estrella's trial and that the defendant's testimony substantially contributed to Estrella's conviction. In light of these facts and the omission of an express requirement that the defendant testify, we reject the trial court's conclusion that the defendant acted in bad faith in violation of the "spirit" of the agreement.[12] Thus, we conclude that the defendant did not breach the agreement when he invoked

[12] In reaching its decision, the trial court relied extensively on *United States* v. *Castelbuono*, 643 F. Sup. 965 (E.D.N.Y. 1986), in which the United States District Court had found that, even though the cooperation agreement at issue did not contain any provision requiring the defendant, Anthony C. Castelbuono, to perform a specific act, Castelbuono's "bad faith, intentional, substantial omission [of information and documents] . . . constitute[d] a materially false statement and thereby a breach of the agreement." Id., 971. Analogizing the facts of *Castelbuono* to the facts of the present case, the trial court found that "the defendant intentionally [invoked] the fifth amendment [privilege against self-incrimination] and, in bad faith, failed to testify, and, as in *Castelbuono*, this type of intentional action [rose] to the level of a materially false statement and thus a breach of the [plea] agreement." This case is distinguishable from *Castelbuono*, however, because the facts of that case are materially different from the facts of the present case.

First, Castelbuono, an attorney, had approached the government, offering to provide information on a vast, international criminal conspiracy in exchange for protection and immunity. See id., 967–68. The District Court thus emphasized that "the resulting agreement was the result of extensive negotiations between [Castelbuono and his counsel] and [certain assistant United States attorneys]. . . . Castelbuono may not . . . escape the terms of the agreement [that] he freely bargained for . . . ." Id., 968–69. In contrast, the defendant in the present case had been arrested and was facing serious charges, including felony murder, when he entered into the agreement with the state. Thus, his bargaining power and ability to affect the terms of the agreement were significantly less than that of Castelbuono. Second, and more significantly, in *Castelbuono*, the government specifically alleged, and the District Court found, that Castelbuono had withheld important documents and tape recordings from the government, had claimed an inability to recall certain significant details that were contained in the documents he had withheld and had omitted important facts concerning criminal ventures in which he had been involved. Id., 971. Moreover, the District Court found that the government had established at least two instances in which Castelbuono had made materially false statements to the government, thereby expressly breaching the agreement. Id., 972. In the present case, the state had not alleged that the defendant withheld information or ever provided anything other than truthful information.

his constitutional privilege not to testify in order to avoid the risk of self-incrimination.[13]

We turn now to the defendant's request for an order of specific performance. This court has held that the same concept of fairness that requires the state to keep the promises that it has made to induce a defendant's cooperation or guilty plea "ordinarily impels the court, in its discretion, either to accord specific performance of the agreement or to permit the opportunity to withdraw the guilty plea." *State* v. *Littlejohn*, 199 Conn. 631, 644, 508 A.2d 1376 (1986); accord *State* v. *Garvin*, supra, 242 Conn. 313; *State* v. *Niblack*, 220 Conn. 270, 283, 596 A.2d 407 (1991); *State* v. *Reid*, 204 Conn. 52, 58, 526 A.2d 528 (1987). As the United States Supreme Court has instructed, when the state has not honored a plea bargain, the court must determine which of these remedies is required by due process. See *Santobello* v. *New York*, supra, 404 U.S. 263. "One alternative may do justice in one case, and the other in a different case. In choosing a remedy, however, a court ought to accord a defendant's preference considerable, if not controlling, weight inasmuch as the fundamental rights flouted by [the state's] breach of a plea bargain are those of the defendant, not of the [s]tate." Id., 267 (Douglas, J., concurring); see also *United States* v. *Palladino*, supra, 347 F.3d 34 ("[t]he remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement . . . [and] [t]he

---

[13] Because neither the state nor the defendant sought to introduce evidence with respect to the meaning of the plea agreement, our resolution of the parties' dispute necessarily hinges on the construction of the four corners of the written plea agreement. Consequently, we are not required to determine when, if ever, extrinsic evidence may be admissible for the purpose of ascertaining the intent of the parties with respect to an ambiguous term in a plea agreement. We reiterate, however, that, as a general rule, the state bears the burden of drafting the plea agreement with sufficient care and clarity such that an examination of extrinsic evidence to determine its meaning will not be necessary.

choice between these remedies is generally a discretionary one guided by the circumstances of each case" [citations omitted; internal quotation marks omitted]); *United States* v. *Kummer*, 89 F.3d 1536, 1543 (11th Cir. 1996) (when government does not honor plea agreement "the court should order specific performance or afford the defendant an opportunity to withdraw the plea; and specific performance is preferred").

In the present case, the defendant has requested an order of specific performance in accordance with the arrangement provided in the plea agreement. In particular, the defendant seeks an order permitting him to plead guilty to one count of kidnapping in the first degree for his involvement in Disla's murder, and directing the state to recommend a sentence of twenty years incarceration, execution suspended after five to ten years, as determined by the sentencing court, and five years probation. "[T]he primary purpose of a decree of specific performance, which is always an equitable remedy, is to place an injured [party] in a position that replicates, as nearly as possible, that which [he or she] would have enjoyed but for the [other party's] unexcused breach." *State* v. *Lex Associates*, 248 Conn. 612, 631, 730 A.2d 38 (1999). As we have explained, the state already has received the benefit of its bargain, and the defendant has fully complied with his obligations under the plea agreement. Thus, it would be manifestly unfair to limit the defendant's remedy to the right to withdraw his plea. Such a remedy effectively would leave the defendant, who has provided information in accordance with the agreement that could be used against him in a future prosecution, at a substantial disadvantage, whereas the state would be left with the windfall of the defendant's information and Estrella's conviction.[14]

---

[14] We note that this outcome likely would not inure to the benefit of the state in the long run, as it would discourage future cooperation by codefendants wary of being caught in the same predicament as the defendant in the present case.

"The availability of specific performance is not a matter of right . . . but depends rather [on] an evaluation of equitable considerations." *Kakalik* v. *Bernardo*, 184 Conn. 386, 395, 439 A.2d 1016 (1981). Generally, the determination of what equity requires in a particular case is within the discretion of the trial court. E.g., id. Because the state has failed to raise any factual issues that would affect the equitable determination in the present case, however, we reject the state's contention that a determination of the propriety of granting specific performance requires a factual weighing of the equities by the trial court. Inasmuch as the defendant has upheld his end of the plea agreement to the benefit of the state, we conclude that fairness dictates that he is entitled to the benefits of the plea bargain.[15] See, e.g., *Spence* v. *Superintendent, Great Meadow Correctional Facility*, supra, 219 F.3d 175 ("because [the defendant] upheld his end of the [plea] agreement [as] long as he was allowed to, there [was] no basis . . . to conclude [that the state] could not adhere to its promise [under the agreement], and essential fairness mandate[d] specific performance of the sentence [that the defendant] bargained for"). Accordingly, the defendant is entitled to specific performance.

The judgment is reversed and the case is remanded with direction to grant the motion to dismiss and to grant the defendant's request for an order of specific performance of the plea agreement.

In this opinion the other justices concurred.

---

[15] Thus, it would be an abuse of discretion for the trial court to deny the defendant's request for specific performance under the circumstances of the present case. Cf. *Kakalik* v. *Bernardo*, supra, 184 Conn. 396 (trial court did not abuse its discretion in ordering specific performance).