******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JENNIFER HELMEDACH *v.* COMMISSIONER OF
CORRECTION
(AC 38026)

Lavine, Prescott and Mihalakos, Js.

*Argued April 18—officially released September 27, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Adrienne Maciulewski*, assistant state's attorney, for the appellant (respondent).

*Conrad Ost Seifert*, assigned counsel, for the appellee (petitioner).

*Opinion*

PRESCOTT, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court in favor of the petitioner, Jennifer Helmedach, granting her petition for a writ of habeas corpus.[1] On appeal, the respondent claims that the habeas court improperly concluded that the petitioner's trial counsel provided ineffective assistance of counsel by failing to inform the petitioner of a plea offer until after she had testified at the underlying criminal trial. Having thoroughly reviewed the record prior to oral argument,[2] we concluded after oral argument that the habeas court properly granted the petitioner's petition for a writ of habeas corpus. Immediately thereafter, we orally affirmed the judgment of the habeas court.[3] Consistent with that ruling, we now issue this written opinion.

The following facts, as set forth by our Supreme Court in the petitioner's direct criminal appeal, and procedural history are relevant to this appeal. "On September 1, 2004 . . . the [petitioner, the petitioner's infant daughter, Ayanna, and the petitioner's boyfriend, David Bell, were driven] to the apartment of Sarah Tarini in Meriden. Tarini lived in the apartment with her ten year old daughter, Summer, and she had been allowing Michael Fontanella and Shanna Kropp to stay in one of the apartment's two bedrooms for several weeks. The [petitioner] and Bell asked Tarini if they could spend the night there and told her that they would be going to New York the next day. Tarini agreed to let the [petitioner], Ayanna and Bell stay in the bedroom where Fontanella and Kropp usually stayed.

"On September 2, 2004, Kropp told the [petitioner] that she and Bell would have to leave Tarini's apartment. The [petitioner] appeared to Kropp to be aggravated and annoyed at this request. At about 6 p.m., the [petitioner] left the apartment with Ayanna, stating that she was going to call someone on a pay telephone to get a ride. The [petitioner] called the victim, Faye Bennett, who was a good friend of the [petitioner] and someone she had known since childhood, and asked her to come to the location of the pay telephone to pick her up. The victim, who was approximately six or seven months pregnant, arrived in her Chevrolet Blazer a short time later. The [petitioner] repaid the victim $20 that she previously had borrowed from her and the victim gave the [petitioner] a pair of sneakers as a birthday gift for Ayanna. At about 7 p.m., the victim called her boyfriend, told him that she and the [petitioner] were going to Tarini's apartment, and asked if he wanted to join them. He declined.

"At approximately 7:30 p.m. that same evening, Tarini, Summer, Fontanella and Kropp left the apartment and walked to a nearby store to purchase cell phone minutes and ice cream. At approximately 7:45 p.m.,

Scott Baustien, who lived in the first floor apartment directly below Tarini's apartment, saw the [petitioner] and the victim walk by his window and heard them walk up to the second floor and enter Tarini's apartment. He then heard thumping noises. Baustien also noticed that the victim's Blazer, which was parked in the driveway, was blocking his car and a car belonging to Clarence Labbe, who lived above Tarini in the building's third floor apartment. Baustien telephoned Labbe to tell him about the Blazer. Labbe told Baustien that he also had heard banging noises coming from Tarini's apartment, which he assumed were caused by children playing.

"Baustien then went outside to check the Blazer that was blocking the driveway and saw the [petitioner] seated behind the steering wheel and Ayanna in the passenger seat. He told the [petitioner] that she could not park there. The [petitioner], who appeared to Baustien to be extremely nervous and as 'white as a ghost,' said, 'I'm sorry, I'm sorry, I'm sorry,' and backed the Blazer quickly down the driveway toward the road, hitting the corner of the apartment building in the process. After Baustien returned to his apartment, he heard footsteps going down the front stairs of the apartment and a car horn beeping several times.

"At approximately 8:15 p.m., Tarini, Summer, Fontanella and Kropp returned to the apartment. Tarini knocked on the door of the bedroom where the [petitioner] and Bell had been staying. When she received no response, she opened the door and saw that the room was covered with blood and that there was a body in a garbage bag on the bed. Tarini immediately asked Fontanella to take Summer upstairs to Labbe's apartment and called 911. A short time later, Captain Timothy Topulos and Officer Justin Hancort of the Meriden police department arrived at the scene. They met Tarini and Fontanella, who were visibly shaken, outside the building. They then entered Tarini's apartment and observed the bloody crime scene and the victim's body on the bed. They also saw a baby bottle on the bedroom floor. Topulos summoned medical personnel, who determined that the victim was dead.

"Initially, the police misidentified the victim as the [petitioner]. It was not until the next day, during the victim's autopsy, that the victim was correctly identified as Bennett. The chief medical examiner determined that the cause of the victim's death was multiple stab wounds and strangulation. The [petitioner] and Bell were apprehended in the Bronx, New York, approximately eight days after the victim's murder." (Footnotes omitted.) *State* v. *Helmedach*, 306 Conn. 61, 66–69, 48 A.3d 664 (2012).

During the jury trial that followed, "[t]he state's theory was that the [petitioner] had lured the victim to Tarini's apartment so that she and Bell . . . could steal the victim's car and money and escape to New York. The

[petitioner] claimed that the evidence did not support a finding that she had lured the victim to the apartment so that she and Bell could rob her, and that her participation in the robbery after Bell's assault on the victim and his threat to kill her if she did not get the victim's car and wait for him in front of the building was the result of duress." Id., 69–70. Ultimately, however, the petitioner was found guilty of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), and conspiracy to commit robbery in the third degree in violation of General Statutes §§ 53a-48 and 53a-136. She was sentenced by the trial court to a term of incarceration of thirty-five years. The judgment of conviction was affirmed on appeal. See *State* v. *Helmedach*, 125 Conn. App. 125, 8 A.3d 514 (2010), aff'd, 306 Conn. 61, 48 A.3d 664 (2012).

Thereafter, on November 19, 2014, the petitioner filed an amended petition for a writ of habeas corpus, alleging ineffective assistance of trial counsel. The petitioner claimed that the performance of her trial counsel, Richard Reeve, was deficient because he failed to timely and meaningfully communicate a plea offer of ten years to the petitioner.[4] On November 19 and December 12, 2014, the habeas court, *Cobb, J.*, held a trial in which it heard testimony from the petitioner; Reeve; Gary Nicholson, the assistant state's attorney who prosecuted the case; and Michael Sheehan, Reeve's law partner.

After trial, the habeas court granted the petition for a writ of habeas corpus. In a corrected written memorandum of decision dated August 26, 2015,[5] the court concluded that Reeve's failure to relay the favorable offer to the petitioner in a timely manner before it was withdrawn fell below the objective standard of reasonableness required by attorneys under the state and federal constitutions. The habeas court granted certification to appeal. This appeal followed.

The respondent claims that the habeas court improperly concluded that Reeve had provided ineffective assistance to the petitioner by delaying to inform her of a plea offer until after she had completed her trial testimony. More specifically, the respondent contends that the habeas court improperly relied on *Missouri* v. *Frye*, U.S. , 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012), and *Sanders* v. *Commissioner of Correction*, 83 Conn. App. 543, 851 A.2d 313, cert. denied, 271 Conn. 914, 859 A.2d 569 (2004), in finding that Reeve's performance was deficient, because neither *Frye* nor *Sanders* addresses whether it is reasonable trial strategy for a defense attorney to delay informing the client of a plea offer if valid strategic reasons exist for that decision. The respondent also argues that Reeve's performance was objectively reasonable under the circumstances.

In response, the petitioner argues that Reeve's con-

duct could not be reasonable trial strategy because, as a matter of law, the decision made by Reeve to delay informing the petitioner of a favorable plea offer is not one that counsel constitutionally is allowed to make because it undermined the petitioner's ability to meaningfully exercise a right that belongs solely to her. Thus, in the petitioner's view, Reeve's conduct cannot be characterized as a matter of trial strategy. The petitioner alternatively contends that if this court decides that Reeve's decision to delay communicating the plea offer to her was a matter of strategy, it should conclude that Reeve did not make a *reasonable* strategic decision under the circumstances. We agree with the petitioner that Reeve's decision to delay informing the petitioner about a plea offer was not within the realm of strategic decisions that an attorney is allowed to make.

The following additional facts, as found by the habeas court, are relevant to this claim. "Reeve was appointed to represent the petitioner after her arrest and represented her throughout the pretrial and trial proceedings in this case. . . . Like most criminal cases, the parties in this case engaged in pretrial plea negotiations in an attempt to resolve the case prior to trial. On December 18, 2006, the state made its first plea offer to the petitioner during a supervised pretrial with Judge Damiani. With Judge Damiani's assistance, the state offered the petitioner a plea to robbery or conspiracy to commit robbery and incarceration in the range of fifteen to twenty years, with the right to argue to the court that it impose a sentence at the low range or the 'floor.' The judge approved the [plea offer], but indicated to [Reeve] at the pretrial that he would likely sentence the petitioner at the high end of the range, absent some compelling circumstances that arose at the sentencing hearing. [Reeve] said he would discuss the offer with the petitioner and the state indicated it would discuss it with the victim's family.

"[Reeve] met with the petitioner and relayed to her the offer. He advised the petitioner about the strengths and weaknesses of the state's case, her defense and the risks of going to trial. The petitioner agreed to accept the offer. On January 10, 2007, [Reeve] wrote to [Nicholson] and indicated that the petitioner accepted the offer. . . . [Reeve] did not receive a written response from [Nicholson].

"At the next supervised pretrial, in mid-January 2007, [Nicholson] informed [Reeve] and the judge that the victim's family did not support the proposed agreement, and as a result, the state was withdrawing it. As a result, the parties decided to forgo plea negotiations until after the petitioner's codefendant, [Bell], had been tried or his case resolved.

"On May 23, 2007, Bell was convicted on all charges and on December 14, 2007, was sentenced to eighty-five years incarceration.

"This case was then placed on the trial list.

"On August 24, 2007, [Reeve] filed a motion to compel specific performance of the original plea offer. That motion was denied [by the court].

"The case proceeded to trial and while the parties were selecting the jury, the state made its second plea offer to the petitioner. That offer was twenty-two years, suspended after seventeen years incarceration. After discussing this offer with [Reeve], the petitioner rejected it.

"The state then made its third offer, during jury selection or during the first days of its case-in-chief. That offer was fourteen years to serve. The petitioner rejected this third offer, after conferring with [Reeve]. [Reeve] explained to the petitioner that if convicted she would be facing at least thirty years in prison, as the felony murder charge had a twenty-five year mandatory minimum sentence.

"The petitioner rejected the second and third offers because the state's case had been weakened as a result of its key witness', Gabriel Colon, recantation of his prior oral statement to police that the petitioner spoke to him about participating in the setup of the robbery of the victim. Because Colon had not provided a written statement to police, his prior statement could not be introduced under [the] *Whelan* doctrine.[6] Colon was the only witness that was able to tie the petitioner directly to the robbery. Tying the petitioner to the robbery was essential to establishing the underlying felony on the felony murder charge.

"The petitioner's criminal trial was held on various days between October 1, 2007, and October 16, 2007. On Friday, October 5, 2007, the state rested its case.

"After the state rested, the case was continued to the following Tuesday, October 9, 2007. The courts were closed on Monday in observance of Columbus Day.

"[Nicholson] did not make any offers to the petitioner on Friday, October 5, 2007. Over the weekend, [Reeve] spent numerous hours at the York prison in Niantic, where the petitioner was incarcerated, preparing the petitioner for her testimony, which would begin the following Tuesday.

"On Tuesday morning, October 9, 2007, [Reeve] arrived at his office early to prepare for trial. Between 9:15 and 9:30 a.m., [Reeve] received an unexpected call from [Nicholson]. During the call, [Nicholson] offered the petitioner ten years to serve. [Reeve] told [Nicholson] that he had spent the entire weekend prepping the petitioner for her testimony on Tuesday. [Reeve] explained that although he believed that ten years was a very favorable offer, he was concerned about relaying it to the petitioner immediately prior to her testimony because she was young and flustered, and he believed

that this unexpected news would negatively impact her testimony. [Reeve] asked [Nicholson] if he could convey the offer after the petitioner testified, and [Nicholson] said: 'that's okay.'

"After the call from [Nicholson] and prior to leaving for court that Tuesday morning, [Reeve] stopped by the office of his partner, [Sheehan], to inform him of the unexpected call he received from [Nicholson], the offer of ten years, as well as his concerns about relaying the offer to the petitioner before she testified.

"[Sheehan] agreed that the ten year offer was favorable and advised [Reeve] that he should not wait to communicate the offer to the petitioner until after she testified.

"In view of [Nicholson's] acquiescence to leave the offer open, [Reeve] followed his instincts and did not relay the offer to the petitioner on Tuesday morning, but instead waited until after her testimony concluded. The petitioner's testimony took two and one-half days. Upon learning of the ten year offer after she testified, the petitioner expressed her desire to accept it and indicated she wanted to discuss it with her mother and attorney jointly.

"[Reeve] then approached [Nicholson] and told him the petitioner was interested in accepting the offer of ten years. [Nicholson] informed [Reeve] that the offer was withdrawn.

"When [Reeve] returned to his office, he relayed these events to [Sheehan]. [Sheehan] told him that his failure to relay the ten year offer to the petitioner prior to its withdrawal created an issue of [Reeve's] ineffectiveness under *Sanders* v. [*Commissioner of Correction*, supra, 83 Conn. App. 543]. [Sheehan] was aware of the *Sanders* case because he handled the matter on appeal. [Nicholson] was also involved in that case, having prosecuted . . . Sanders.

"With the offer withdrawn, the trial continued to its conclusion with the petitioner being convicted by the jury on the charges and later sentenced by the court to thirty-five years incarceration.

"At some point, [Reeve] approached [Nicholson] and told him that he had not relayed the ten year offer in a timely manner and that as a result, he believed there existed an ineffectiveness claim against him under the *Sanders* case. He told Nicholson he felt terrible about the situation and wished there was something he could do to remedy it.

"On January 27, 2008, [Reeve] sent a letter to Public Defender Martin Zeldes, the head of the public defenders' appellate unit, explaining the circumstances surrounding the final offer of the state, and his failure to convey the offer to the petitioner prior to its being withdrawn by the state.

"The petitioner would have accepted the ten year plea offer prior to its withdrawal had she been informed of the offer by her counsel in a timely manner, prior to it being withdrawn.

"The parties stipulated that 'Judge Damiani would have accepted the plea resolution and sentenced the petitioner in accordance with the state's final offer.' "

As an initial matter, we set forth the applicable standard of review and principles of law. "The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the federal constitution, and by article first, § 8, of the constitution of Connecticut." *Sanders* v. *Commissioner of Correction*, supra, 83 Conn. App. 549. "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment [to the United States constitution]. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712–13, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . ." *Strickland* v. *Washington*, supra, 697.

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . [T]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012). On appeal, the respondent expressly disavowed making any challenge to the habeas court's factual findings.

"The Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings." (Internal quotation marks omitted.) *Missouri* v. *Frye*, supra, 132 S. Ct. 1405.

"[P]lea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages. Because ours is for the most part a system of pleas, not a system of trials . . . it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process. . . . In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." (Citations omitted; internal quotation marks omitted.) Id., 1407. In *Hill* v. *Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985), the United States Supreme Court expressly established that *Strickland*'s two-part test governs ineffective assistance claims in the plea bargain context.

In the present case, the respondent concedes that if indeed Reeve performed deficiently, the habeas court properly determined that the petitioner suffered prejudice on the basis of a reasonable probability that (1) the petitioner would have accepted the ten year plea offer had it been conveyed to her immediately, and (2) the trial court would have accepted the plea agreement and sentenced the petitioner accordingly. Our review and analysis, therefore, is confined to the first prong of *Strickland*, the performance prong.

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (Citations

omitted; internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 688–90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 632–33, 126 A.3d 558 (2015).

At the same time, however, if the choice at issue implicates a fundamental right of constitutional magnitude, such a choice is "distinguishable from [a] tactical trial [right] that [is] not personal to the defendant and that counsel may choose to [make] as part of trial strategy." (Internal quotation marks omitted.) *State* v. *Fleury*, 135 Conn. App. 720, 728, 42 A.3d 499, cert. denied, 305 Conn. 919, 47 A.3d 388 (2012). "An attorney undoubtedly has a duty to consult with the client regarding important decisions, including questions of overarching defense strategy. . . . That obligation, however, does not require counsel to obtain the defendant's consent to every tactical decision. . . . *But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate.* A defendant . . . has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal. . . . Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

"A guilty plea . . . is an event of signal significance in a criminal proceeding. By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers. . . . While a guilty plea may be tactically advantageous for the defendant . . . the plea is not simply a strategic choice; it is itself a conviction . . . and the high stakes for the defendant require the utmost solicitude . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Florida* v. *Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004).

"The opportunity to testify is . . . a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. . . . Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. . . . [The Fifth Amendment's privilege against self-incrimination] is fulfilled only when an accused is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will. . . . The choice of whether to testify in one's own defense . . . is an exercise of the constitutional privilege."

(Citations omitted; internal quotation marks omitted.) *Rock* v. *Arkansas*, 483 U.S. 44, 52–53, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). With these legal principles in mind, we turn to the merits of the case.

We agree with the petitioner that this court need not consider whether, under the circumstances, Reeve's challenged action might be considered *sound* trial strategy, because the challenged action does not fall under the umbrella of trial strategy at all. The habeas court found that although Reeve "believed that ten years was a very favorable offer, he was concerned about relaying it to the petitioner immediately prior to her testimony because she was young and flustered, and he believed that this unexpected news would negatively impact her testimony." Such paternalistic decision-making on the part of defense counsel infringed upon the petitioner's basic trial right to plead guilty, which she, alone, had the ultimate authority to determine whether to exercise.[7]

Moreover, defense counsel's decision was not a matter of trial strategy, let alone a *reasonable* strategic decision, because, pursuant to *Frye*, if defense counsel violates his duty to communicate timely to the accused formal plea offers from the prosecution, he fails to render the effective assistance that the United States constitution requires. See *Missouri* v. *Frye*, supra, 132 S. Ct. 1408. The basis for this rule is grounded largely in professional performance standards that govern the practice of law. See id.

In *Frye*, the defendant was charged with a felony arising from driving with a revoked license. Id., 1404. The prosecution sent a letter to his defense counsel that offered a choice between two plea bargains, with the offers set to expire on a fixed date. Id. Defense counsel did not inform the defendant of the offers, and after they lapsed, the defendant pleaded guilty but on more severe terms. See id., 1404–1405. The court held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. . . . When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires. Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides. The American Bar Association recommends defense counsel '*promptly* communicate and explain to the defendant all plea offers made by the prosecuting attorney,' ABA Standards for Criminal Justice, Pleas of Guilty 14–3.2 (a) (3d ed. 1999) . . . . The standard for *prompt* communication and consultation is also set out in state bar professional standards for attorneys." (Citations omitted; emphasis added.) Id., 1408.

The respondent argues that the holding in *Frye* does not apply to the facts of the present appeal because this is not a "lapsed plea" case, i.e., Reeve did *not* allow the state's ten year plea offer to expire without first advising the petitioner of it.[8] The respondent also argues that an attorney's duty to *promptly* inform his client of a plea offer, as discussed in *Frye*, does not constitute an obligation for the attorney to *immediately* convey the plea offer. Therefore, this case requires us to consider the meaning of the term "promptly" as contemplated by the United States Supreme Court.

As support for his argument, the respondent specifically references the language in *Frye* in which the court states that "[a]ny exceptions to [the general] rule [that defense counsel has the duty to communicate plea offers to the accused] need not be explored here, for the offer was a formal one with a fixed expiration date." Id. Because, according to the respondent, Reeve presented the petitioner with the plea offer at the conclusion of her trial testimony *before* he was aware the state withdrew its offer, *Frye* does not resolve the narrow question presented by the facts of this case, which, as framed by the respondent, is, "whether a criminal defense attorney performs within the wide range of reasonable professional assistance by deciding to delay informing the client of a plea offer for a valid strategic reason and [when] the attorney has good reason to believe that the offer would remain open."[9] (Footnote omitted.)

We agree with the respondent that *Frye* does not necessarily control this case. We decline, however, to read *Frye* as narrowly as urged by the respondent because the respondent's assertion essentially ignores the thorough reasoning that the court provided for the general rule in *Frye*, which appears in the court's opinion immediately after its establishment of the rule. As previously discussed, the court repeatedly emphasized the requirement for *prompt* communication between defense counsel and client as set forth in both American Bar Association and state bar professional standards for attorneys. Id. Indeed, rule 1.4 of this state's Rules of Professional Conduct provides in relevant part: "(a) A lawyer shall: (1) *promptly* inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules . . . [and] (3) keep the client reasonably informed about the status of the matter . . . . (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."[10] (Emphasis added.) One such circumstance in which an attorney is required to promptly relay information to the client is set forth in rule 1.2 (a) of the Rules of Professional Conduct, which provides in relevant part: "In a criminal case, the lawyer shall abide by the client's decision,

after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify. . . .”

In determining whether Reeve acted promptly, within the confines of *Frye*, when he delayed informing the petitioner of the ten year plea offer until after her trial testimony had concluded, it is necessary to define the meaning of “promptly” as it is used in rule 1.4 (a) (1) of our Rules of Professional Conduct. When pressed at oral argument, the respondent conceded that defense attorneys have a duty to communicate plea offers promptly to their clients, but contended that *Frye* does not stand for the proposition that defense attorneys are required to communicate plea offers *immediately* to their clients; accordingly, the respondent contends that the term “promptly” does not equate to the term “immediately.” In contrast, the petitioner asserted that defense counsel’s duty was to communicate the plea offer immediately and without undue delay. Given that the Rules of Professional Conduct appear in our Practice Book, and given that “[t]he interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation”; (internal quotation marks omitted) *Wiseman* v. *Armstrong*, 295 Conn. 94, 99, 989 A.2d 1027 (2010); we employ our well established tools of statutory construction to determine the term’s meaning.

“The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [we] consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . .” (Citation omitted; internal quotation marks omitted.) Id., 99–100.

We first note that rule 1.0 of the Rules of Professional

Conduct, entitled "Terminology," does not define "promptly." Absent this definition, in order to assign "promptly" its ordinary definition, "[w]e look to the dictionary definition of the [term] to ascertain [its] commonly approved meaning." (Internal quotation marks omitted.) *Rivers* v. *New Britain*, 288 Conn. 1, 17, 950 A.2d 1247 (2008). The eleventh edition of Merriam-Webster's Collegiate Dictionary defines "prompt" as "being ready and quick to act as occasion demands . . . performed readily or immediately . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). In addition, Random House Webster's Unabridged Dictionary defines "prompt" as "done, performed, delivered, etc., at once or without delay." Random House Webster's Unabridged Dictionary (2d Ed. 2001). Similarly, although Black's Law Dictionary does not offer a definition for the word "prompt" used in the form of an adjective or adverb, it defines the verb form of "prompt" as "[t]o incite, esp. to *immediate* action." (Emphasis added.) Black's Law Dictionary (9th Ed. 2009). In turn, Black's Law Dictionary defines "immediate" as "[o]ccurring without delay; instant . . . ." Black's Law Dictionary, supra.

On the basis of these "commonly approved" definitions, an interpretation of the term "promptly" that would allow an attorney to delay informing his client about a plea offer well after counsel had an opportunity to do so, would be unreasonable. Each of these dictionary definitions references either immediacy or a lack of delay, concepts which the petitioner advanced in her construction of the term "promptly." In contrast, because the respondent argues that "promptly" does not necessarily mean "immediately" and admits that defense counsel here acted *with* delay, that construction of the term is unpersuasive. Accordingly, we determine that the term is clear and unambiguous for purposes of our statutory construction analysis.

In applying the common meaning of "promptly" to the facts of the present case, it is clear that Reeve did not act promptly in informing the petitioner of the plea offer. Once Reeve received the extremely advantageous ten year offer from Nicholson on the morning of October 9, he decided to wait to tell the petitioner about the offer until after she had taken the stand in her own defense and gone through her entire trial testimony, which ultimately took two and one-half days to complete. Significantly, the respondent does not claim on appeal that Reeve was prevented by circumstances outside of his control from communicating the plea offer to his client for several days. Because the trial proceeded on October 9, the very same day Reeve received the offer from Nicholson, Reeve obviously was interacting with his client throughout each of the following days and had ample time to communicate the offer and to discuss the risks and benefits of accepting or rejecting it. In making the conscious decision to delay

delivering this information to his client, Reeve did not act immediately or without delay within the definition of "promptly."[11] Nicholson's agreement to keep the offer open did not obviate Reeve's duty to promptly inform his client of the offer. Therefore, Reeve failed to comply with our Rules of Professional Conduct and, by extension, failed to fulfill his duty to timely communicate offers from the state in derogation of *Frye*.[12]

Because defense counsel's actions prevented the petitioner from properly exercising her constitutional right to plead guilty and to make a fully informed decision as to whether to testify on her own behalf, we agree with the petitioner that Reeve's decision may not properly be viewed as trial strategy at all, much less a *reasonable* trial strategy. Nevertheless, even if we were to consider counsel's decision to delay communicating the plea offer as falling within the penumbra of trial strategy, we would find that Reeve's decision was not reasonable under the circumstances.

In keeping with the analysis set forth in *Strickland*, we afford Reeve the presumption that the challenged decision might be considered sound trial strategy, and evaluate the decision from Reeve's perspective, under the circumstances as of the time of his conduct. See *Strickland* v. *Washington*, supra, 466 U.S. 689–90. In the present case, the habeas court found that after Reeve received the unexpected phone call and ten year plea offer from Nicholson, his immediate reaction was to tell Nicholson "that he had spent the entire weekend prepping the petitioner for her testimony on Tuesday," and that although "he believed that ten years was a very favorable offer, he was concerned about relaying it to the petitioner immediately prior to her testimony because she was young and flustered, and he believed that this unexpected news would negatively impact her testimony."[13] Moreover, on the basis of the record before us, the habeas court reasonably could have found that Reeve did not delay informing the petitioner of the offer for any reason grounded in legal strategy, such as increasing the chances of a more favorable plea offer from the state or of an acquittal by the jury. When asked during his habeas trial testimony whether it was true that he wanted the offer to remain open through the petitioner's trial testimony "for strategic reasons, so that you can see how . . . how she would do," Reeve responded, "I don't think that really—I don't really think that was a factor in my mind, to be honest. I think I said that earlier. I wasn't really thinking about that time, well, what if she falls apart on the stand, or, alternatively, as you're now positing a question, what if she does better? I've answered both. I would answer the same way, that really wasn't in my limited thinking calculus at that time." Given that, from Reeve's perspective, he withheld the exceptionally advantageous ten year offer from his client in the sole interest of protecting her fragile emotional state and has not explained

how this would affect his trial strategy, Reeve's conduct cannot be considered sound trial strategy.[14]

Further, Reeve's decision is unreasonable in the context of the history of Reeve and Nicholson's plea negotiations in this case. As the habeas court found, the state made its first offer to the petitioner, a plea to robbery or conspiracy to commit robbery and incarceration in the range of fifteen to twenty years, during a supervised pretrial conference in December, 2006. The judge approved the sentence, and Reeve said he would discuss the offer with the petitioner, and the state indicated it would discuss it with the victim's family. After Reeve advised the petitioner about the strengths and weaknesses of the state's case, her defense, and the risks of trial, the petitioner agreed to accept the offer, and Reeve wrote to Nicholson on January 10, 2007, to inform him of the petitioner's acceptance. Reeve did not receive a response from Nicholson, and at the next supervised pretrial conference in mid-January, Nicholson informed Reeve and the judge that the state was withdrawing the offer due to the lack of support from the victim's family. On August 24, 2007, Reeve filed a motion to compel specific performance of the original plea offer, which the court ultimately denied.

On the basis of these events, Reeve knew that Nicholson had already rescinded a plea offer that had been discussed by both parties in a supervised pretrial conference, had been agreed to by the judge, had been open for several weeks, and already had been accepted by the petitioner in writing. In fact, Reeve had been so concerned with the circumstances surrounding the withdrawal of the earlier plea offer that he had taken the time to file a motion to compel specific performance of the offer. That he did not register any similar concern about the possible withdrawal of a much better offer that arrived orally, by telephone, in the last moments before his client was to testify in her own defense, is unreasonable on his part.

Finally, as additional evidence that establishes that Reeve's decision lacked reasonableness, we turn our attention to the testimony of Sheehan, Reeve's law partner. Pursuant to the habeas court's factual findings, after Reeve received the call from Nicholson and prior to when he left for court, Reeve stopped by Sheehan's office to inform him of the ten year plea offer as well as his concerns about relaying the offer to the petitioner before she testified. Significantly, "Sheehan agreed that the ten year offer was favorable and advised Attorney Reeve that he should not wait to communicate the offer to the petitioner until after she testified." Reeve, however, decided to follow "his instincts" and wait to tell the petitioner.

Although Reeve certainly was not bound by Sheehan's advice, it makes a difference, for purposes of analyzing the reasonableness of his decision, that Reeve

was made aware by a fellow attorney, his law partner, that the decision might not be a reasonable course of action under the circumstances. That Reeve quickly dismissed Sheehan's recommendation reinforces the conclusion that defense counsel's mind was closed to advice and that he acted unreasonably, without meaningfully calculating the risks of his decision beforehand.

In sum, we conclude that even if defense counsel's conduct was a matter of trial strategy, the petitioner has successfully rebutted the presumption, under that framework, that defense counsel's conduct was reasonable. Ultimately, however, we conclude that defense counsel's decision to delay communication of the plea offer to the petitioner cannot be considered an exercise of trial strategy under the facts of this case; thus, he performed deficiently. We, therefore, conclude that the habeas court did not improperly conclude that the petitioner's trial counsel provided ineffective assistance. Accordingly, we affirm the judgment of the habeas court. As the habeas court terminated the appellate stay and returned the matter to the criminal trial court for further proceedings, we hereby order the trial court to fashion, on an expedited basis, an appropriate remedy pursuant to *Ebron* v. *Commissioner of Correction*, 307 Conn. 342, 53 A.2d 983 (2012).

The judgment is affirmed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

[1] The habeas court granted the respondent's petition for certification to appeal from the judgment.

[2] On March 3, 2016, the petitioner filed a motion to expedite this appeal. The motion requested that it be assigned for oral argument before the end of the court year on the ground that the likely remedy, should this court affirm the habeas court's judgment, would be the imposition of the ten year sentence offered by the state. As the petitioner had already served more than ten years of her sentence, this court granted that motion to expedite on March 4, 2016.

[3] In the ruling from the bench on April 18, 2016, we specified that the decision to affirm the habeas court's ruling was made by two members of the three member panel. At that point in the proceedings, the third panel member, Judge Mihalakos, indicated the desire for additional time to determine whether to join the other members of the panel in deciding to affirm the judgment of the habeas court. Subsequently, and consistent with the corrected memorandum of decision issued by the habeas court, we immediately ordered the matter returned to the criminal court for further proceedings.

[4] The petitioner also included a second claim that her trial counsel's pretrial and trial representation was ineffective because he failed to investigate sufficiently the state's evidence and failed to have a pretrial assessment of the petitioner conducted by an expert on battered women's syndrome. In its memorandum of decision, the habeas court noted that "[t]he petitioner did not provide evidence of this second claim during the trial and did not include the issue in [her] posttrial briefs"; it, therefore, "consider[ed] the issue abandoned." The petitioner has not challenged the habeas court's decision with regard to her second claim as an adverse ruling that should be considered in the event the respondent is successful in his appeal. See Practice Book § 63-4 (a) (1) (B). Accordingly, we do not address it further.

[5] The habeas court issued its original memorandum of decision on May 15, 2015, and issued a corrected memorandum of decision on August 26, 2015. The sole difference between the two decisions concerns the remedy ordered by the court.

[6] *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S.

994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[7] By not timely informing the petitioner of the ten year plea offer, defense counsel not only deprived the petitioner of critical information that might have resulted in her foregoing the remainder of the trial in favor of pleading guilty, but, by virtue of the point in the trial during which the plea offer was made, deprived her of critical information that may well have factored into how she internally weighed the risks and benefits of testifying in her own defense. The decision made by the petitioner to testify was thus arguably based upon an incomplete calculus. Ultimately, the petitioner was entitled to make both decisions—whether to plead guilty and whether to testify in her own defense—fully informed of the state's very favorable plea offer.

[8] This argument is dependent entirely on the habeas court's factual finding that after Reeve asked Nicholson if he could convey the ten year offer to the petitioner *after* she finished testifying, Nicholson replied, "That's okay."

[9] We note that the petitioner never filed an additional motion with the court asking that the court permit the petitioner to accept the ten year offer and be sentenced accordingly. The parties have not directed us to any criminal case, nor have we been able to find any, on the issue of whether the state can validly withdraw a plea offer after promising to keep it open. It is clear, however, that the interpretation of plea agreements is governed by contract law. *State* v. *Rivers*, 283 Conn. 713, 724–28, 931 A.2d 185 (2007).

A plea agreement is "evaluated with reference to the requirements of due process"; (internal quotation marks omitted) id., 724; however, "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest. It is the ensuing guilty plea that implicates the Constitution." (Footnote omitted.) *Mabry* v. *Johnson*, 467 U.S. 504, 507–508, 104 S. Ct. 2543, 81 L. Ed. 2d 437 (1984). Under Connecticut law, "[a]n offer may be withdrawn before acceptance, and a bare offer is ordinarily held to be withdrawn unless accepted immediately. The offer may be accompanied by a promise not to withdraw it within a specified time. In that case it may be accepted within the time specified, before an actual withdrawal. The promise not to withdraw is without consideration and cannot be enforced." *Patterson* v. *Farmington Street Railway Co.*, 76 Conn. 628, 642, 57 A. 853 (1904). "This court has long held that an offer imposes no obligation upon either party, until it is accepted by the offeree, according to the terms in which the offer was made. . . . Our holdings adhere to the basic principle of contract law that an offeror is the master of his offer, and therefore, is not obligated to make an offer on any terms except his own. . . . Thus, [a]n offer can be accepted by the rendering of a performance only if the offer invites such an acceptance." (Citation omitted; internal quotation marks omitted.) *Auto Glass Express*, *Inc.* v. *Hanover Ins. Co.*, 293 Conn. 218, 227, 975 A.2d 1266 (2009).

[10] Similarly, rule 1.3 of the Rules of Professional Conduct sets forth a general standard for attorneys to act with diligence, providing: "A lawyer shall act with reasonable diligence and promptness in representing a client."

[11] We do not mean to suggest that it is irrelevant to our analysis that counsel believed that the offer was to remain open for some period of time. Instead, the fact that an offer remains open is simply one aspect to be considered by a court in determining whether counsel "promptly" informed his or her client of the offer. In other words, the length of time that the offer is to be held open may impact how quickly an attorney must communicate the offer to his or her client in light of all of the other circumstances presented, including whether the offer is made at a stage in the trial proceedings during which other important decisions regarding the defense of the case must be made, the attorney's ease of access to the client, and the attorney's obligations to other clients.

[12] The respondent additionally argues that the habeas court's reliance on *Sanders* v. *Commissioner of Correction*, supra, 83 Conn. App. 543, was misplaced. In *Sanders*, this court upheld the habeas court's conclusion that the defendant's attorney had rendered ineffective assistance of counsel by failing to explain *meaningfully* the state's plea offer. Id., 546, 550–52. In the present case, we find the habeas court's reliance on *Frye* to be dispositive for the reasons previously discussed and, thus, decline to address the applicability of *Sanders*.

[13] This finding is supported adequately by the record. For example, during his habeas trial testimony, the following exchange took place between Reeve and counsel for the respondent:

"Q. If you were going to recommend this ten year offer . . .

"A. Right.

"Q. And thereby have a chance at resolving the case, why would you elect

to go forward and have [the petitioner] testify for days and days? It's a tremendous amount of work. It's a tremendous amount of stress for her. . . .

"A. Well, I think, obviously in hindsight, I made a terrible mistake. . . . [A]s I indicated earlier, I knew that [the petitioner] had had a series of emotional difficulties before, there's a documented history of mental issues and problems. I knew she was very vulnerable during this trial, very emotional, very raw and very anxious about her testimony, and so that's why.

"Q. Well, if you knew that she was in such a fragile emotional state, wouldn't that be all the more reason to give her the opportunity to avoid being subjected to cross-examination by telling her about this offer?

"A. I think that's a rational conclusion. I wish I'd taken that position at that time. I didn't do that and I regret it."

[14] In some respects, this decision bears some resemblance to a doctor who chooses to withhold critical medical information from a patient whose health is at risk on the ground that he does not want to upset her. Although the choice to withhold this information from a patient may be motivated by a beneficent purpose, it violates a patient's fundamental autonomy to make critical decisions about his or her care. See *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 288, 465 A.2d 294 (1983) ("[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body" [internal quotation marks omitted]). Likewise, it is not reasonable for counsel to choose to withhold critical information from a criminal defendant whose constitutional liberties are at stake on the ground that he does not want to distress her.