******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# RAFAEL FERNANDEZ *v.* COMMISSIONER OF CORRECTION
## (AC 37692)

Alvord, Bright and Bear, Js.

*Syllabus*

The petitioner, who previously had been convicted of arson in the first degree and murder, filed a third petition for a writ of habeas corpus, claiming, inter alia, that his right to a fair trial under the state and federal constitutions had been violated. Specifically, he claimed that because A, an attorney with the Office of the State's Attorney, initially had prosecuted his criminal case before the trial court declared a mistrial on the ground that A had become a potential witness in the case, the Office of the Chief State's Attorney, which prosecuted the petitioner's criminal case in the second trial, should have disqualified itself from the case under the Rules of Professional Conduct. The habeas court granted the motion to dismiss filed by the respondent Commissioner of Correction and rendered judgment thereon, from which the petitioner, on the granting of certification, appealed to this court. *Held* that the habeas court properly dismissed the petitioner's third habeas petition, as the petition failed to state a claim upon which habeas relief could be granted; the petitioner could not assert, on the facts alleged, a claim for relief under the applicable rules (1.10 and 3.7) of the Rules of Professional Conduct, as neither rule 1.10 nor 3.7 required disqualification of the attorneys in all of the state's attorney's offices and the Office of the Chief State's Attorney, the petitioner provided no basis for any conclusion that certain statements he had made to A during plea discussions while the petitioner was self-represented were privileged, as an attorney-client relationship did not exist between the petitioner and A, and although the petitioner claimed that A's potential testimony regarding the petitioner's statements to A would have been inadmissible and that the threat of A's testimony effectively prevented him from testifying in his own defense, that claim was entirely speculative, especially given that the petitioner did not file a motion in limine to obtain a ruling regarding the admissibility of A's potential testimony.

Argued May 20—officially released October 22, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, and tried to the court, *Oliver, J.*; judgment dismissing the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Dante R. Gallucci*, for the appellant (petitioner).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Rafael Fernandez, appeals from the judgment of the habeas court dismissing his second amended petition for a writ of habeas corpus, which alleged that communications between the then self-represented petitioner and the assistant state's attorney during plea negotiations, and the resulting implication of the assistant state's attorney as a potential witness at the petitioner's trial, required the disqualification of all of the state's attorney's offices and the Office of the Chief State's Attorney, and that the failure of the Office of the Chief State's Attorney to disqualify itself violated his right to a fair trial. On appeal, the petitioner claims that the habeas court improperly granted the motion to dismiss the petition filed by the respondent, the Commissioner of Correction, on the ground that the petition failed to state a claim upon which habeas corpus relief can be granted. We disagree and, accordingly, affirm the judgment of the habeas court.

The following relevant facts and procedural history are set forth in part in our Supreme Court's decision on the petitioner's direct appeal from his conviction. See *State* v. *Fernandez*, 254 Conn. 637, 758 A.2d 842 (2000), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001). "The [petitioner] was arrested on September 14, 1995, and charged with felony murder in violation of General Statutes § 53a-54c, murder in violation of [General Statutes] § 53a-54a (a), first degree burglary in violation of General Statutes § 53a-101 (a), and first degree arson in violation of [General Statutes] § 53a-111 (a) (1). In addition, the [petitioner] was charged with tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1). The [petitioner] received the assistance of the office of the public defender from the time that he first appeared before the court on September 15, 1995, until a privately retained counsel, Attorney William T. Gerace, filed an appearance on the [petitioner]'s behalf on December 19, 1995." (Footnotes omitted.) Id., 640. On May 15, 1996, Gerace made an oral motion to withdraw from the case, which was granted by the court, *Espinosa, J.* Id., 640–41. "Gerace indicated that the [petitioner] could retain new counsel within two weeks . . . ." Id., 641.

"Evidently, the [petitioner] did not retain new counsel during the period between May 15 and May 29, 1996. Although the record is unclear at this point, it appears that the [petitioner] had asked the court if he could proceed pro se because, on May 30, 1996, Judge Espinosa indicated that she had 'not decided whether . . . [the petitioner was going to] be allowed to represent [himself] . . . .' Judge Espinosa then appointed a public defender who would serve as standby counsel in the event that the [petitioner] was allowed to proceed pro se or who would serve as lead counsel in the event

that the [petitioner] was not permitted to proceed pro se. Judge Espinosa then stated that, in the meantime, the public defender could talk to the [petitioner] about the [petitioner's] decision to proceed pro se. Judge Espinosa also tried to impress upon the [petitioner] the seriousness of his situation and the foolhardiness of proceeding pro se: 'You are not a lawyer and you are going to be going against an experienced lawyer on the other side that wants to convict you and send you to jail for sixty years.'

"On June 24, 1996, the matter of the [petitioner's] representation still was not finalized. Michael Isko, a public defender, filed an appearance as standby counsel for the [petitioner], and Judge Espinosa granted another continuance in light of the [petitioner's] request for more time to retain private counsel.

"On July 10, 1996, however, the [petitioner] appeared in court with Isko and stated that he wanted to represent himself. At that time, the [petitioner] knowingly and intelligently waived his right to counsel before the trial court, *Norko*, *J*. Isko remained as standby counsel.

"Throughout the following months, the [petitioner] filed various pro se motions, including a motion for access to a law library on September 18, 1996, which Judge Barry granted on October 2, 1996, 'subject to availability of accommodations within the dep[artment] of [c]orrection.'

"On October 30, 1996, the office of the attorney general appeared on behalf of the commissioner of correction and moved to vacate Judge Barry's October 2 order granting the [petitioner] access to a law library. Arguments on that motion were heard on October 30." (Footnotes omitted.) Id., 641–43.

"Before indicating how he would decide the motion to vacate, Judge Barry again stressed to the [petitioner] the seriousness of his decision to represent himself:

"The Court: You're unable to retain your own attorney, I presume, a private attorney? Is that right?

"[The Petitioner]: I do not want to retain. I can afford it, but I do not want to retain him.

"The Court: And you don't want the services of a public defender . . . on a full-time basis?

"The [petitioner] indicated that he did not want a public defender, and that he did not wish to receive advice from standby counsel. Judge Barry then inquired of the [petitioner]: It may be that your only chance is by retaining an attorney or by having access to the courts through the public defender's office . . . . Do you understand? The [petitioner] replied: Yes.

"On November 25 and December 5, 1996, the [petitioner] was brought to court to review the state's file. At this point, the record is unclear again. Evidently, the

[petitioner's] pro se status had changed because Isko was appointed as the [petitioner's] public defender on January 8, 1997 and filed an appearance in lieu of the [petitioner] on January 15, 1997.

"On February 4, 1997, the [petitioner] filed another motion to return to pro se status, which was granted by Judge Espinosa on February 5, and Isko again was appointed standby counsel. Jury selection began on February 10, before Judge Norko. After several of his pro se motions had been denied, the [petitioner], on February 14, before Judge Norko, requested to change his pro se status, and Isko agreed to file an appearance as full counsel. On February 27, Judge Barry granted the commissioner's motion to vacate the previous order granting the [petitioner] access to a law library.

"On March 7, 1997, Isko asked for a continuance, claiming that he lacked sufficient time to prepare for trial in light of his relatively recent change in status to full counsel and the somewhat technical nature of the evidence. To accommodate Isko, Judge Norko ordered the office of the public defender to provide Isko with cocounsel and continued the case until March 14, 1997. On March 14, however, Judge Norko declared a mistrial, relying on the fact that the state's attorney could be called as a witness because of various communications with the [petitioner] while the [petitioner] was proceeding pro se."[1] (Footnote omitted; internal quotation marks omitted.) Id., 644–45.

In a footnote, our Supreme Court provided: "Judge Norko stated: '[B]ased upon [Isko's] reading of the file and research, the [petitioner] is changing [his] defense, which implicates the present state's attorney as a possible witness for the state . . . . With that in mind, the court will declare a mistrial in this particular case. The court will also note that no witnesses were called for the record—that we haven't finished impaneling an entire jury.'

"Furthermore, Judge Norko indicated that he found 'no fault' with the state, the office of the state's attorney or the office of the public defender, and 'that the court [was] somewhat at fault for not viewing it as a possible conflict in the future.' Judge Norko continued: 'However, I don't think that anyone could have predicted that we'd end up in this and, if the defense had remained the same, we wouldn't be in this particular position.' " Id., 645 n.13.

"On April 23, 1998, the [petitioner] expressed his desire to proceed pro se again, as well as his desire to be tried by a three judge panel rather than a jury. The [petitioner] then was canvassed by the trial court, *Clifford*, *J.*, regarding his decision to proceed pro se, the appointment of standby counsel, and his election to be tried by a three judge panel. At this time, the [petitioner] voluntarily waived his right to counsel and his right to

a jury trial. Isko again was assigned to be standby counsel. On May 18, 1998, the [petitioner's] case was tried before a three judge panel, *Devlin*, *Fasano* and *Maloney*, *Js.* Isko served as standby counsel during that trial.

"On May 29, 1998, the panel found the [petitioner] guilty of arson in the first degree and murder. . . . The panel found the [petitioner] not guilty of felony murder, burglary in the first degree and tampering with physical evidence. The [petitioner] was sentenced to a total effective term of fifty-five years imprisonment." (Citation omitted.) Id., 646. On direct appeal from his conviction, the petitioner claimed that "the trial court, *Espinosa*, *J.*, denied him his constitutional right to counsel in granting defense counsel's motion to withdraw," and also challenged "the order of the trial court, *Barry*, *J.*, vacating its previous order, which had granted the [petitioner's] pro se motion to be transferred to another correctional facility in order to gain access to a law library." Id., 639. The petitioner claimed that "this action resulted in the failure of the state to fulfill its constitutional obligation to provide pro se criminal defendants with access to the courts." Id. Our Supreme Court rejected both claims. Id.

Approximately eighteen months after our Supreme Court affirmed the petitioner's conviction, the petitioner filed his first habeas petition. See *Fernandez* v. *Commissioner of Correction*, 86 Conn. App. 42, 43–44, 859 A.2d 948 (2004). The habeas court dismissed that petition on the ground that the two claims raised therein "were identical to those discussed and ruled on by our Supreme Court in the petitioner's direct appeal . . . ." Id., 44. This court affirmed the judgment of the habeas court. Id., 51.

On April 1, 2005, the petitioner instituted a second habeas action, in which he claimed that "Gerace rendered ineffective assistance by virtue of the manner in which he withdrew as the petitioner's trial counsel," and "his attorney during the first habeas trial, Timothy Aspinwall, rendered ineffective assistance by failing to raise a claim of ineffective assistance of counsel in the first habeas petition." *Fernandez* v. *Commissioner of Correction*, 291 Conn. 830, 833, 970 A.2d 721 (2009). After a hearing, the habeas court denied the petition and granted the petition for certification to appeal filed by the petitioner. Id., 831 n.1. Our Supreme Court affirmed the judgment of the habeas court. Id., 837.

On March 28, 2012, the petitioner filed a third habeas action, which underlies the present appeal. In his second amended petition for a writ of habeas corpus, the petitioner claimed that his right to a fair trial, under the state and federal constitutions, was violated. He alleged that an attorney from the Office of the State's Attorney for the judicial district of Hartford, Assistant State's Attorney Joan Alexander, initially prosecuted his criminal case before the court declared a mistrial

on the basis that Alexander became a potential witness in the case. The petitioner alleged that the Office of the Chief State's Attorney, which prosecuted his case in the second trial, "should have disqualified itself from the case under the Rules of Professional Conduct, Rules 3.7, and 1.10, in essence, and the State's Attorney's Office for the judicial district of Hartford, and the Chief State's Attorney's Office, is a 'firm' for purposes of those rules, and that as a member of that firm was a potential witness in the case, that firm was disqualified from participation in the trial."[2]

On May 30, 2014, the respondent filed a motion to dismiss the second amended habeas petition on the ground that the petition failed to state a claim upon which habeas relief could be granted. Specifically, the respondent argued that even if the original prosecutor was considered a necessary witness and disqualified under rule 3.7 of the Rules of Professional Conduct, the other attorneys in her office were not disqualified from litigating the case. The respondent further argued that rules 1.7, 1.9, and 1.10 of the Rules of Professional Conduct "govern conflicts of interest with current and former clients" and thus, "did not prohibit other prosecutors from [prosecuting] the petitioner's case." The petitioner filed an objection to the motion to dismiss, arguing that his claim was "more than a claim of an ethical violation, it is a prosecutorial misconduct claim, based upon an actual conflict of interest, which deprived the petitioner of a fair trial . . . ." He argued that the presence of the Office of the Chief State's Attorney in the case "had the chilling effect of preventing the [petitioner] from testifying, for concern that this 'firm' would call as a witness one of its own members to rebut the defense presented, by utilizing privileged information obtained before being disqualified for possessing this very same information."

In support of his claim, the petitioner submitted an affidavit from Assistant State's Attorney Alexander. Alexander submitted answers under oath to questions propounded to her by the petitioner. In those answers, she stated that she served as an assistant state's attorney for the judicial district of Hartford and was the trial prosecutor in the case of *State* v. *Fernandez*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CR-95-0478387-S. She stated that "the court declared a mistrial just before the evidence was about to commence," upon finding "that the [petitioner] would be denied effective assistance of counsel." She responded that she "did not prosecute the subsequent trial and [did] not recall any specific personal involvement." Alexander could not recall whether she was assigned to the Office of the Chief State's Attorney or the Office of the State's Attorney for the judicial district of Hartford during the time of the petitioner's second trial in May, 1998. Alexander also could not recall whether she testified in the petitioner's trial at that

time. Alexander answered that she did discuss the case with Domenick Galluzzo, Deputy Chief State's Attorney. The petitioner's final question asked: "[D]id any of those discussions include discussion of any matters discussed with Rafael Fernandez, himself, while he was acting as his own counsel in the first trial?" Alexander responded: "Not to my recollection."

The court held argument on the respondent's motion to dismiss the petition on August 13, 2014. In its memorandum of decision issued on December 3, 2014, the court granted the respondent's motion. The court noted at the outset that the petitioner based "the entirety of his claim on the . . . Rules of Professional Conduct governing attorney-client relations." Noting that "there is no claim that there was ever any attorney-client relationship between the trial prosecutors and the petitioner," the court stated that "[t]he petitioner seeks the creation of a new rule based on an unreasonable interpretation of two of the Rules of Professional Conduct and a failure to harmonize those two rules with the Rules of Professional Conduct as a whole." As to the claim that the disqualification of Alexander required disqualification of all of the state's attorney's offices and the Office of the Chief State's Attorney, the court, citing *Anderson* v. *Commissioner of Correction*, 127 Conn. App. 538, 546, 15 A.3d 658 (2011), aff'd, 308 Conn. 456, 64 A.3d 325 (2013), noted well settled case law that "the Rules of Professional Conduct do not impute conflicts between associated government attorneys."

The court concluded by stating: "In truth, the petitioner is attempting to assert a claim of ineffective assistance of counsel against himself and disguise it as prosecutorial misconduct based on a conflict of interest. No habeas relief is available to him on these facts and bases." The court dismissed the petition on the ground that it failed to state a cause of action upon which relief can be granted. On December 18, 2014, the court granted the petitioner's petition for certification to appeal. This appeal followed.

On appeal, the petitioner claims that the habeas court erred in granting the respondent's motion to dismiss. First, he argues that "the disqualification of the trial prosecutor's office, the judicial district of Hartford, should have resulted in the disqualification of the [Office of the Chief State's Attorney], as those offices are part of the same law firm, for the purposes of conflict of interest rules . . . ." He argues that the failure of the Office of the Chief State's Attorney to disqualify itself constituted prosecutorial misconduct. Second, he argues that "the trial prosecutor's obtaining of privileged information during pretrial negotiations and discussions with the petitioner while he was acting pro se, threatened testimony regarding inconsistent statements and defenses at the subsequent trial, and disclosure of that information to the successor counsel from the

[Office of the Chief State's Attorney], further violated the conflict of interest rules . . . ." Specifically, he argues that he was prevented from testifying regarding his defense of self-defense because he feared Alexander would testify regarding prior inconsistent statements he made to her, including that he was not present at the time the crime occurred.[3] We conclude that the petition failed to state a claim upon which habeas relief can be granted. Specifically, the petitioner cannot assert, on the facts alleged, a claim for relief under the Rules of Professional Conduct and, thus, the habeas court properly dismissed his habeas petition.

We first set forth our standard of review. "The standard of review of a motion to dismiss is . . . well established. In ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The conclusions reached by the [habeas] court in its decision to dismiss the habeas petition are matters of law, subject to plenary review. . . . Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record." (Internal quotation marks omitted.) *Abdullah* v. *Commissioner of Correction*, 123 Conn. App. 197, 201, 1 A.3d 1102, cert. denied, 298 Conn. 930, 5 A.3d 488 (2010).

The petitioner's claim on appeal challenges the habeas court's interpretation and application of the Rules of Professional Conduct, which requires plenary review. "Given that the Rules of Professional Conduct appear in our Practice Book, and given that [t]he interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation . . . we employ our well established tools of statutory construction to determine the term's meaning.

"The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [we] consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratex-

tual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . .'' (Citation omitted; internal quotation marks omitted.) *Helmedach* v. *Commissioner of Correction*, 168 Conn. App. 439, 459–60, 148 A.3d 1105 (2016), aff'd, 329 Conn. 726, 189 A.3d 1173 (2018).

The petitioner's first argument is that Alexander's alleged disqualification should have resulted in the disqualification of the Office of the Chief State's Attorney because all state's attorney's offices are part of the same law firm for purposes of the conflict of interest rules. We disagree that the principle of imputed disqualification applies in this matter.

We first set forth the relevant language of the Rules of Professional Conduct in effect at the time of the petitioner's trial.[4] Rule 1.7 (a) of the Rules of Professional Conduct provided: ''A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) Each client consents after consultation.'' Rule 1.7 (b) of the Rules of Professional Conduct provided: ''A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) The lawyer reasonably believes the representation will not be adversely affected; and (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.'' Rule 1.10 (a) of the Rules of Professional Conduct, on which the petitioner relied in his second amended petition, stated: ''While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8 (c), 1.9 or 2.2.''[5] Rules 1.10 and 1.11 of the Rules of Professional Conduct were amended, effective January 1, 2007, and the revisions ''adopted the express distinction that conflicts are not imputed between current government employees.''[6] *Anderson* v. *Commissioner of Correction*, supra, 127 Conn. App. 546, 548–49 (''[R]ules of Professional Conduct do not require the imputation of conflicts of interest among public defenders working in the same office on the basis of reasoning that they are

members of the same firm").

Rule 3.7 (a) of the Rules of Professional Conduct, on which the petitioner also relied in his habeas petition, provides: "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where: (1) The testimony relates to an uncontested issue; (2) The testimony relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client." Rule 3.7 (b) provided that "[a] lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9."

Rule 1.7 of the Rules of Professional Conduct governs a lawyer's representation of a client where representation of that client "will be directly adverse to another client" or may "be materially limited by the lawyer's responsibilities to another client . . . ." In the present case, the habeas court noted that the petitioner had not alleged an attorney-client relationship between himself and any of the prosecutors involved in his criminal case. The habeas court found that "only an adversarial relationship existed between the parties." The petitioner does not challenge this finding on appeal. Thus, rule 1.7, which addresses conflicts of interest arising out of the representation of clients, is inapplicable.

Rule 1.10 (a) of the Rules of Professional Conduct, which addresses imputation of conflicts, provided that the other lawyers in a firm cannot represent a client when any one of them would be prohibited from doing so by rule 1.7, which governs general conflicts; rule 1.8 (c), which prohibits the preparation of an instrument giving the lawyer any substantial gift from a client; rule 1.9, which governs former clients; or rule 2.2, which governs a lawyer's action as an intermediary between clients. Because none of the enumerated rules applied to prohibit Alexander's participation in the petitioner's case, rule 1.10 (a) would not prohibit the other lawyers in her firm from participating in the case. In other words, there was no conflict to be imputed to all of the state's attorney's offices and the Office of the Chief State's Attorney.[7]

Additionally, even if the Office of the Chief State's Attorney and the Office of the State's Attorney for the judicial district of Hartford were considered one "firm," absent the specific conflict situations addressed in rules 1.7 or 1.9, rule 3.7 did not prohibit a lawyer in the Office of the Chief State's Attorney from trying a case in which another lawyer in the "firm" was likely to be called as a witness. Because rules 1.7 and 1.9 did not preclude Alexander's participation in the petitioner's case, there was no disqualification to be imputed pursuant to rule 3.7.[8] Accordingly, neither rule 1.10 nor rule 3.7 of the Rules of Professional Conduct required disqualification

of the attorneys in all of the state's attorney's offices and the Office of the Chief State's Attorney.

The petitioner's second argument is that the prosecutors violated rule 3.8 of the Rules of Professional Conduct, which sets forth the special responsibilities of prosecutors.[9] Specifically, he emphasizes that "the trial prosecutor's obtaining of privileged information during pretrial negotiations and discussions with the petitioner while he was acting pro se, threatened testimony regarding inconsistent statements and defenses at the subsequent trial, and disclosure of that information to the successor counsel from the [Office of the Chief State's Attorney] further violated the conflict of interest rules . . . ." He argues that "the trial prosecutor did not honor her responsibility to treat the petitioner fairly, in obtaining the information absent a valid waiver of his constitutional rights, if she viewed the petitioner solely as a party, or, in threatening to testify using that information, if she viewed the petitioner as counsel, knowing such communications are privileged." We disagree.

Because the petitioner's argument is predicated on Alexander's receipt of privileged information from the petitioner, the lack of an attorney-client relationship between the petitioner and Alexander is dispositive. The petitioner provides no basis for any conclusion that the petitioner's statements to Alexander during plea discussions were privileged. Although the petitioner characterizes his communications with Alexander as privileged, he has not alleged any relationship beyond an adversarial one and, consequently, has identified no privilege existing under statutory or common law that may have attached to his statements. Cf. *Hardison* v. *Commissioner of Correction*, 152 Conn. App. 410, 418, 98 A.3d 873 (2014) ("[Our Supreme Court has] recognized that the attorney-client privilege was created to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observation of law and the administration of justice" [internal quotation marks omitted]).[10]

Furthermore, the petitioner's argument that Alexander's potential testimony regarding the then self-represented petitioner's statements made during plea discussions would have been inadmissible and that the threat of Alexander's testimony "effectively prevent[ed] the [petitioner] from testifying in his own defense" is entirely speculative. The petitioner's counsel recognized during oral argument before this court that the petitioner could have filed a motion in limine to obtain a ruling regarding the admissibility of Alexander's potential testimony. In light of his failure to seek such a ruling, we will not speculate whether Alexander could have provided admissible evidence in the petitioner's criminal trial or whether the petitioner's decision to

refrain from testifying in his defense was due to Alexander's potential testimony.[11] See *Ramos* v. *Commissioner of Correction*, 172 Conn. App. 282, 320, 159 A.3d 1174 ("[b]ecause this court is constrained to evaluating demonstrable realities, we will not engage in mere speculation" [internal quotation marks omitted]), cert. denied, 327 Conn. 904, 170 A.3d 1 (2017); *Grant* v. *Commissioner of Correction*, 121 Conn. App. 295, 303–304, 995 A.2d 641 ("[i]n a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities" [internal quotation marks omitted]), cert. denied, 297 Conn. 920, 996 A.2d 1192 (2010).

We conclude that the petitioner's habeas petition fails to state a claim upon which habeas corpus relief can be granted and, thus, the habeas court properly dismissed the habeas petition.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] During the March 14, 1997 court appearance, the following colloquy occurred between the court and Isko:

"The Court: Now, in your preparation for this particular position to go to trial today as you've indicated, you're prepared to begin trial, has the theory of the defense changed in any way?

"[Defense Counsel]: Most accurately, Your Honor. Based on our preparation and, again, what we needed to do was to give advice to the client, it became clear that there were a number of theories of a defense. Clearly what was presented to Mr. Fernandez; I have advised him on his right to testify and that is clearly a much—clearly much more of a possibility now than it was when he was conducting the case, yes.

"In that sense a theory of defense that is a serious defense, and the court has noted that can be full of theories of defenses based on the careful evaluation of the evidence and that the evidentiary rules have changed, and what can be presented now can be considerably different.

"The Court: All right. And you're aware of course, Mr. Isko, that Mr. Fernandez in his capacity was representing himself, has had individual conversations within the presence of the state's attorney concerning . . . his theory of defense of that particular period of time and other discussions of the case with Attorney Alexander.

"[Defense Counsel]: I was, at the time that these discussions were in pretrial process, as standby counsel. Again, I was not always requested to be present. And there were conversations that I was aware of but not present and, again, because I was not requested to be there by Mr. Fernandez.

"I want to be frank with the court so, yes, I am aware that there were discussions going on. And just this morning it was brought to my attention and I think I at one point I may have—I was aware [that] Mr. Fernandez was filing motions and there was additional correspondence and statements sent him. It has been brought to my attention, yes.

"The Court: And the fact that the state has had individual correspondence, at this particular time from your particular client specifically addressed to the state's attorney, does that bring any—does that concern you as to the defense at this particular period of time?

"[Defense Counsel]: Especially in light of conversations we've had this past week. Let me just make it clear, it doesn't concern me as to the actions of the state's attorney or the state's attorney's office. I don't think they're—again, that the time that Mr. Fernandez sent the letters my understanding it was before I was full counsel. He was doing that on his own as pro se.

"The Court: The court's not implying or inferring in any way there's anything wrong with what the state's attorney did what was—what she was supposed to do under the circumstances.

"[Defense Counsel]: Certainly the knowledge of those letters and what the complex sense have been related to do cause me concern as we go forward.

"The Court: Yes. In that concern and with the present knowledge that

you have in your previous preparation, there in your opinion a possibility that the state's attorney—the present state's attorney may have information to the contrary, or may have information given by your client that the state may wish to bring out in its case in chief?

"[Defense Counsel]: Yes."

[2] On May 30, 2014, the respondent filed a return, raising the affirmative defense of procedural default. In his reply, the petitioner asserted, as good cause for his failure to raise his claim at trial or on direct appeal, that "he, as a [self-represented] defendant, was unaware of the rules regarding attorney as witness conflicts, and disqualification, and that this claim, and the underlying claim of conflict, was not discovered by him until after his trial and direct appeal."

In its motion to dismiss, the respondent again raised procedural default as a ground for dismissal of this third action for a writ of habeas corpus. In its memorandum of decision dismissing the petition, the habeas court did not address the respondent's procedural default defense. The respondent argues on appeal that this court may affirm the judgment of dismissal on the alternative legal ground that the petitioner's claim is unreviewable because he failed to establish good cause for his failure to raise it earlier. We decline to reach the procedural default issue because the habeas court addressed the petitioner's claim on the merits and did not address expressly the issue of procedural default. See, e.g., *Crawford* v. *Commissioner of Correction*, 285 Conn. 585, 600 n.8, 940 A.2d 789 (2008) (declining to consider respondent's affirmative defense of procedural default in part because parties did not raise issue at habeas hearing and habeas court did not make any findings of fact or ruling on issue); *Giuca* v. *Commissioner of Correction*, 171 Conn. App. 619, 620 n.1, 157 A.3d 1189 (addressing merits of appeal when habeas court did not address expressly issue of procedural default as raised in return), cert. denied, 326 Conn. 903, 162 A.3d 726 (2017); *Gibson* v. *Commissioner of Correction*, 135 Conn. App. 139, 153 n.2, 41 A.3d 700 (determining that it need not reach procedural default issue in part because court did not rule on affirmative defense), cert. denied, 305 Conn. 922, 47 A.3d 881 (2012); *Brown* v. *Commissioner of Correction*, 92 Conn. App. 382, 383–84 n.1, 885 A.2d 761 (2005) (declining to address respondent's claim that judgment should be affirmed on alternative ground of procedural default in light of decision on merits of petitioner's appeal), cert. denied, 277 Conn. 908, 894 A.2d 989 (2006), appeal dismissed, 281 Conn. 466, 915 A.2d 870 (2007).

[3] In his appellate brief, the petitioner represents that, in pretrial discussions with Alexander, he had "stat[ed] a defense denying his presence at the crime scene." This description of his statement to Alexander is consistent with the representations made by counsel for the petitioner during the hearing before the habeas court on the motion to dismiss. The respondent's counsel stated during the hearing that "I don't think anyone in this room can testify as to what was actually said . . . in that pretrial negotiation . . . . I mean, at this point I think we're all just hypothesizing what could've possibly been said." We note that there were no factual findings made regarding the content of the statements the petitioner made to Alexander. Because we conclude that the petitioner cannot assert a claim for relief under the Rules of Professional Conduct, for purposes of our review, we assume that the petitioner's statement, in substance, was as represented.

[4] All references in this opinion to the Rules of Professional Conduct are to the rules in effect at the time of the petitioner's trial in May, 1998, unless otherwise noted.

[5] The commentary to rule 1.10 of the Rules of Professional Conduct defined "firm" to include "lawyers in a private firm, and lawyers employed in the legal department of a corporation or other organization, or in a legal services organization."

[6] The current version of "[r]ule 1.10 (d) of the Rules of Professional Conduct provides: 'The disqualification of lawyers associated in a firm with former or current government lawyers is governed by Rule 1.11.' Rule 1.11 (d), in turn, subjects current government lawyers to rules 1.7 and 1.9, regarding personal conflicts of interest, but does not provide for the imputation of conflicts. Rather, the commentary to rule 1.11 emphasizes that 'Rule 1.10 is not applicable to the conflicts of interest addressed by this Rule' and explains that '[b]ecause of the special problems raised by imputation within a government agency, *subsection (d)* [*of rule 1.11*] *does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees*, although ordinarily it will be prudent to screen such lawyers. . . .' (Emphasis added.)

Rules of Professional Conduct 1.11, commentary." (Emphasis in original.) *Anderson* v. *Commissioner of Correction*, supra, 127 Conn. App. 545.

[7] Because there was no conflict to be imputed, we need not address whether the amendments to rules 1.10 and 1.11 of the Rules of Professional Conduct subsequent to the petitioner's criminal trial, which adopted the distinction that conflicts are not imputed between current government employees, necessitate the conclusion that the version of rule 1.10 in effect at the time of the petitioner's trial would have required that any conflict be imputed and whether that imputation would extend beyond the attorneys in all of the state's attorney's offices to the Office of the Chief State's Attorney.

[8] In his appellate brief, the petitioner recognizes that "[c]learly, [rule] 1.7 [of the Rules of Professional Conduct], speaking of current clients, and [rule] 1.9 [of the Rules of Professional Conduct] speaking of former clients, are also inapplicable to this case." Instead, he argues that "[the] issue in this case is more analogous to the Code of Judicial Conduct, Rule 2.11 (a) . . . ." Citing the current version of the Code of Judicial Conduct provision governing the circumstances under which a judge shall disqualify himself, the petitioner provides no authority for the application of that provision to the attorneys of all of the state's attorney's offices and the Office of the Chief State's Attorney. Further, the application section of the current Code of Judicial Conduct states that the code's provisions "apply to all judges of the Superior Court, senior judges, judge trial referees, state referees, family support magistrates . . . and family support magistrate referees."

[9] Rule 3.8 of the Rules of Professional Conduct provided, in relevant part, that "[t]he prosecutor in a criminal case shall (2) Make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel; [and] (3) Not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing . . . ." The commentary to that rule stated that "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice . . . ." Rules of Professional Conduct 3.8, commentary.

[10] Moreover, we note that although Alexander answered that she had discussed the petitioner's case with Galluzzo, as to whether any of her discussions with Galluzzo "include[d] discussion of any matters discussed with [the petitioner] himself, while he was acting as his own counsel in the first trial," she answered, "[n]ot to my recollection." Thus, there was no evidence before the habeas court that Alexander had shared the allegedly privileged information with Galluzzo.

The petitioner argues, however, that the mere discussion of the case between Alexander and Galluzzo constituted an impermissible breach of a "Chinese Wall" required pursuant to *State* v. *Jones*, 180 Conn. 443, 457, 429 A.2d 936 (1980), overruled in part on other grounds by *State* v. *Powell*, 186 Conn. 547, 442 A.2d 939, cert. denied sub nom. *Moeller* v. *Connecticut*, 459 U.S. 838, 103 S. Ct. 85, 74 L. Ed. 2d 80 (1982). *Jones* is wholly distinguishable from and inapplicable to the present case, however, in that unlike the defendant in *Jones*, the petitioner has not alleged any attorney-client relationship between himself and any prosecutor affiliated with any of the state's attorney's offices or the Office of the Chief State's Attorney.

[11] The respondent does not concede that Alexander's potential testimony would have been inadmissible and instead argues that the state "would not necessarily have been precluded from calling Alexander for impeachment purposes had [the] petitioner testified."